Argued October 25, affirmed in part, reversed in part and remanded
December 18, 1978, petition for review denied February 13, 1979

# STATE OF OREGON, *Appellant,*
## *v.*
# ROBERT DALE LOWRY, *Respondent.*
## (No. 78-2-298, CA 11152)
588 P2d 623

Karen H. Green, Assistant Attorney General, Salem, argued the cause for appellant. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

John Henry Hingson, III, Oregon City, argued the cause and filed the brief for respondent.

Before Schwab, Chief Judge, and Lee, Richardson and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Defendant was charged with robbery in the first degree. ORS 164.415. Prior to trial he became aware of statements given to the police by Leo Danby Reed, a one-time cellmate of defendant in the Clackamas County Jail. In his statements Reed related numerous admissions made to him by the defendant. Defendant moved for an order "suppressing as evidence the confession/admission allegedly made to Leo Danby Reed, an agent of the State." After a lengthy hearing, the trial court granted the motion to suppress. The state moved for reconsideration or, in the alternative, for more complete findings of fact and conclusions of law. Those motions were denied. The state appeals.

■ ■ The evidence was conflicting and puzzling in several key respects. The trial court made written findings of fact, set forth below. Insofar as those findings concern "historical facts" and are supported by evidence, we are bound by them. Where there is conflicting evidence on an issue of historical fact, but no finding, we must resolve the conflict for the purpose of review in the manner which supports the court's order. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *see also State v. Warner,* 284 Or 147, 585 P2d 681 (1978).

Leo Danby Reed is a dedicated and accomplished "stool pigeon." He has survived for years by (and in spite of) providing information to various police and penal authorities. The breadth of his activities as an informant is remarkable. In at least three felony cases which have reached this court in the last eight years he has been an informant. In two of those cases we upheld murder convictions based largely on confessions made to him. *State v. Brown,* 33 Or App 286, 576 P2d 387 (1978); *State v. Williams,* 2 Or App 367, 468 P2d 909 (1970).[1] During the period from December,

---

[1] Reed later claimed that his testimony against Williams had been deliberately false. Williams filed a petition for post-conviction relief. The petition was dismissed, the trial court finding that Reed's testimony at the

1977, to March, 1978, Reed provided information in at least four homicide cases.

In return for his information Reed has received a variety of rewards. He has been given cash and cigarettes; authorities have refrained from charging him with crimes he has committed; charges pending against him have been dismissed; sentencing concessions have been recommended and apparently granted; various benefits have been conferred and penalties withheld by penal officials. There is no evidence that Reed has ever been paid a salary by any police agency; instead he has either approached the police with information in the hope of being compensated or offered to inform on others when he found himself in trouble.

In February, 1978, Reed was in the Rocky Butte Jail in Multnomah County awaiting sentencing on a federal bank robbery conviction. On February 13, he sent a message through a jailer to Detective Forristall of the Clackamas County Sheriff's Department, saying he wanted to talk to Forristall about a homicide. Reed had previously given Forristall information in another homicide case; and, according to Forristall, he and Reed had a "very close friendship." Forristall called Reed, who told him that another Rocky Butte inmate had admitted committing an unsolved murder of a teenage girl nearly two years before. Reed said he wanted to discuss the matter with Forristall.

On February 14, Forristall and his partner went to Rocky Butte and met with Reed. He gave the detectives further information about the homicide and asked to be transferred to the Clackamas County Jail because the purported murderer, referred to throughout the hearing as "Mr. X," had been sent there. Forristall replied that he would see what could be

---

post-conviction hearing, *i.e.,* that he had earlier lied, was not credible. On that basis we affirmed the dismissal of the petition. *Williams v. Cupp,* 16 Or App 232, 518 P2d 181 (1974).

done. He conveyed Reed's request to a Portland Police Bureau detective with whom he and Reed had previously cooperated, but he did nothing further to arrange a transfer.

On February 27, Reed was given a 15-year sentence on the federal charge. That afternoon he was transferred by federal marshals to the Clackamas County Jail. The evidence does not disclose the arrangements behind that transfer, but everyone involved assumed that it must have been related to Reed's request to be put next to Mr. X.

In the Clackamas County Jail Reed was placed in a large dormitory with Mr. X. The evening of his first day there he called Forristall, told him where he was and asked to see him. Forristall went to the jail. Reed complained that he was not able to talk to Mr. X about the homicide because of a lack of privacy in the dormitory. He asked that he and Mr. X be transferred to a smaller "felony cell." Forristall arranged that transfer late on February 27.

Defendant was indicted for robbery on February 23, 1978. He was arrested February 26 and placed in the Clackamas County Jail. On February 27 he was arraigned and requested counsel. The arraignment was continued to the morning of February 28, when counsel was appointed.

Defendant was one of the men in the felony cell when Reed and Mr. X were placed there on February 27. The precise time and content of the initial conversation between Reed and defendant concerning the charges against defendant is not clear. Reed did testify, however, that he talked with defendant several times about his involvement in the robbery and that each time he got a little more information. Reed explained why he talked to the defendant:

> "Oh, usually when you go into jails like that, you find the majority of people in there, they try to impress you. If you have been to the penitentiary, you know, they tell

you about their crime and I felt like talking to Mr. Lowry or whoever else I might have been talking to in there. Couldn't hurt me any. It could only better the position I was in, which it didn't end up that way but that was why I started talking to him * * *."

"Well, it was on a friendly basis but when we first started talking, I had in my mind all the time to find out all I could find out about the crime."

On February 28, Reed again called Forristall and said he wanted to meet. They met in the jail at 9:30 p.m. that day. According to Forristall, Reed told him that defendant had admitted he had been the "wheel man" in the robbery for which he was charged and that his partner "Pat," who had wielded the shotgun, was also in the Clackamas County Jail. Reed testified that he told Forristall during their February 28 meeting that he had had conversations with the defendant. His testimony did not, however, touch on the extent of his disclosures to Forristall at that time.

During the February 28 meeting, Reed and Forristall also discussed Mr. X, who had by then been transferred to a state mental hospital. It was with Mr. X and the homicide that Forristall was primarily officially concerned. After Reed related on his own initiative the information concerning defendant and the armed robbery, Forristall warned him that he "could not act as an agent" for Forristall and that the detective "didn't want him to go in there and start asking a whole bunch of questions of anybody from then on."

Reed returned to the cell, but despite Forristall's admonitions he continued to ask defendant about the robbery. Between February 28 and March 6, Reed sent out several notes to Forristall, who made no response.

On the evening of March 6, Reed requested that Forristall come to the jail. They met at 8:30 p.m. and discussed Mr. X. Reed also mentioned the defendant and the information he had obtained concerning the

robbery. After the meeting Forristall called Clackamas County Sheriff's Department Detective Harris, who was investigating the robbery, and told him of Reed's information, also noting that Reed was scheduled to be transferred to a federal penitentiary in California the next morning. Harris said he wanted to get a taped statement from Reed and asked if Forristall could arrange to have him held in Clackamas County an additional 24 hours. Forristall made the arrangement.

The next morning (March 7) Harris and Forristall went to the jail, planning to get a taped statement from Reed. Forristall brought along cigarettes for Reed and later put $20 in his account without telling him. Reed refused to make a taped statement. He was angry because of the delay in his transfer to the federal penitentiary. Both Forristall and Harris testified, however, that Reed did talk briefly about the defendant at that time. According to Harris, Reed said defendant had admitted being the wheel man in several robberies, including one at a remote country grocery store, and had stated that his partner, Pat, who was in another part of the jail, had been the one with the shotgun in that robbery. Reed also told Harris that defendant was worried that a girl who had been involved might testify against him.

Reed recalled that he did not talk much to the detectives on the morning of March 7. He did take particular note, however, that Detective Harris asked him if he knew the defendant. At the hearing Reed noted his mental response to Harris' question concerning defendant:

> "Now, this guy is a detective sergeant. If he's that concerned about this guy, maybe I ought to make it my business to find out something about him."

Before Reed went back to the cell, he told Forristall and Harris he needed money. It was then that Forristall decided to put the $20 in his account. There was also evidence that Reed said something to the effect

that he did not want to get involved with the police again.

After the meeting Reed returned to the cell and immediately began one of his well-practiced approaches—which he termed a "sales pitch" — to get more information from defendant:

"Q   Right then what did you do?

"A   I give him the sales pitch you give all those guys, you know, and they tell you all you want to know.

"Q   It was after you talked to Harris you went back in there and gave Lowry the sales pitch?

"A   Yes.

"Q   And about how long after you talked to Harris and found out about his interest in Mr. Lowry did you go begin the pitch with Mr. Lowry?

"A   Oh, I think I went back in the tank.

"Q   Right.

"A   And he was talking to different people about this case so he says something to me and I told him, I says, 'Man, you should stop telling people about your case.' He offered to let me read some kind of transcript he had. I says, 'No, I don't want to read it and you shouldn't let this other guy read it either.' I knew right then that I had him right then. Whatever I asked him, he was going to tell me.

"Q   Your knowledge was because of your prior success?

"A   Not necessarily prior success. It's just human nature with a lot of people, you know, and it worked out right the way I figured it would. He told me about it."

It is not clear precisely what information Reed got from defendant on that occasion, but there were many details in his subsequent statement that he had not related before.

That afternoon Reed sent out a message that he was ready to tell Detectives Forristall and Harris all they wanted to know about the robbery. Harris went to the jail with a tape recorder. Reed suggested that he first tell Harris all he knew without the recorder on. After he had done so, they negotiated a price for the taped

statement. Reed then gave on tape a detailed statement of defendant's admissions, including the name of the store robbed, a description of the car used, the amount of cash and other items taken, the name of a girl involved, the modus operandi of defendant and his partner and many other details. He also related the defense that defendant intended to use. Afterward, Harris paid Reed $50. The next morning Reed was transferred to the federal penitentiary.

At the hearing Reed also noted that "at some point" Forristall told him that

> "the police department was always available to listen to things about crimes that had been committed.
> "* * * * *
>
> "Alls [sic] they said is they would be appreciative for any information concerning any crime that I knew about. They never specified Mr. Lowry or anyone else."

The trial court's findings and conclusion were as follows:

> "*FINDINGS OF FACT*
>
> "1. The witness Reed was placed in the Clackamas County Jail by police officers for the specific purpose of obtaining information from another inmate, Mr. X, regarding an unsolved murder in Clackamas County. Reed originally contacted Officer Forristall regarding this matter while he was incarcerated at Rocky Butte Jail and arrangements were made in some manner to place Reed at the Clackamas County Jail to get information from Mr. X for the police. Reed and Mr. X were confined with the defendant in a tank or cell.
>
> "2. Reed was known to be a long time informant for the Portland Police Bureau. He had previously testified in a trial in Clackamas County regarding admissions made to him by a defendant, while incarcerated together. Reed was known to [curry] favor with police and prosecutors by offer of information or to obtain information of criminal activity of others.
>
> "3. During his stay at the Clackamas County Jail Reed was given $20. and cigarettes by Officer Forristall who was only interested in the unsolved murder.

"4. Reed reported first to Officer Forristall and later to Officer Harris conversations with the defendant regarding a robbery for which defendant had been charged. Officer Harris paid Reed $50. for allowing Harris to record Reed's account of his conversations with the defendant. The contacts of Reed with Forristall and Harris took place over a five or six day period during which Reed talked to defendant four or five times.

"5. Reed professes to be an expert on human behavior and in getting cellmates to talk about their illegal activities. He uses an established approach in eliciting information. Reed gave the defendant a 'sales pitch'. Reed testified 'I knew I had him, he would tell me anything I wanted to know.' Defendant did not initiate or volunteer information to Reed. Reed obtained statements from defendant by interrogation.

"6. All conversations Reed had with defendant were after defendant was indicted, arraigned and had an attorney appointed to represent him on the charge.

"*CONCLUSIONS OF LAW*

"1. Reed was an agent of the police in obtaining information from Mr. X regarding a homicide.

"2. Under all of the surrounding circumstances Reed became an agent of the police in any contact with other prisoners in the jail who were charged with a crime. As such agent of the police, Reed was obliged to afford any prisoner all rights guaranteed by the constitution and laws.

"3. Reed did not advise defendant of any of defendant's rights, nor did defendant make a knowing waiver of any right and particularly his right to have counsel present.

"4. Defendant's motion to suppress statements made by defendant to Reed is allowed and such statements are inadmissible as evidence at trial."

The only substantial issue in this case is whether there was sufficient official police involvement in Reed's obtaining of any of the statements from defendant to bring into play the exclusionary protection of the Fifth Amendment. The trial court found that all the statements were made to Reed after defendant had been indicted and counsel had been appointed. That

was a fair inference to draw from the evidence. Therefore, any statements made in response to interrogation by Reed were properly suppressed *if* the police were sufficiently involved under the rule in *Massiah v. United States,* 377 US 201, 84 S Ct 1199, 12 L Ed 2d 246 (1964), and *McLeod v. Ohio,* 381 US 356, 85 S Ct 1556, 14 L Ed 2d 682 (1965). *See also Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

■ The state argues that all of defendant's statements were volunteered or made after waiver of his rights to remain silent and to have an attorney present. The trial court found that "defendant did not initiate or volunteer information to Reed. Reed obtained statements from defendant by interrogation." Although we do not consider those to be issues strictly of historical fact, we agree with the court's conclusion. Although Reed's methods of obtaining information were necessarily subtle, he candidly explained how he initially approached defendant with the purpose of gaining as much information as possible:

"Q: And how did you go about finding out about the case?
"A: Well, first he told me that his attorney had told him not to speak to anyone about it. I told him that was the right thing to do because he never knew who he might be talking to and one thing led to another. I made some suggestions on how much time I thought he would get if he was convicted, how much time I thought he would have to do, and the more I talked to him, you know, I kind of asked him questions about the case, you know. He just started telling me."

The trial court's conclusion that defendant made no "knowing waiver of any right and particularly his right to have counsel present" was correct. The state did not satisfy its burden of proving a waiver.

■ If Reed was acting on his own, independently of the police, the exclusionary rule would not apply. *Burdeau v. McDowell,* 256 US 465, 41 S Ct 574, 65 L Ed 1048 (1921). On the other hand, if the police were directly or

[ 651 ]

indirectly involved to a sufficient extent in initiating, planning, controlling or supporting his activities, the exclusionary protection would apply.

■ No hard and fast rule has been established for determining when official involvement is sufficient to bring the exclusionary rule into effect. Each case must be evaluated on its own facts. In *State v. Becich,* 13 Or App 415, 509 P2d 1232 (1973), where the defendant moved to suppress evidence obtained in a search by a private citizen, we stated the following general guidelines:

> "The purpose of the exclusionary rule in this type of case is to discourage officials from participating or engaging indirectly in searches which would be illegal if conducted by the official. It seems clear that exclusion of the evidence in this case would be in consonance with the purpose of the exclusionary rule if the extent of participation of the officer in the unlawful search was sufficient to make the police a party to the illegal search. The extent of official involvement in the total enterprise is the crucial element." 13 Or App at 419. (Citations omitted.)

The trial court concluded that "Reed was an agent of the police in obtaining information from Mr. X regarding a homicide." With that we agree. The court also concluded that

> "[u]nder all of the surrounding circumstances Reed became an agent of the police in any contact with other prisoners in the jail who were charged with a crime."

With that we do *not* agree.

■ The initial mission that the police were supporting was clear. Reed was to obtain information from Mr. X concerning a particular homicide. Mr. X had not been indicted for that crime; the use of a secret informant to interrogate him was not in violation of his constitutional rights. *Hoffa v. United States,* 385 US 293, 87 S Ct 408, 17 L Ed 2d 374 (1966). Reed had no official authority to initiate interrogation of defendant. He did that for his own purposes without any suggestion from

the police. Detective Forristall did not even know of defendant's existence before his conversation with Reed on February 28. We decline to hold, as defendant would have us do, that the police may not use an informant, in particular an informant such as Reed who has repeatedly demonstrated a skilled propensity to gather incriminating information, to obtain lawfully information about a particular crime from a particular person without constituting him a police agent with respect to everyone from whom he might obtain information.

The statement by Detective Forristall to Reed that the police "would be appreciative for any information concerning any crime that [Reed] knew about" was not placed in any clear time frame. Reed testified only that "at some point" Forristall had told him that. The trial court did not specifically place any reliance on that statement. It is so indefinite in time, content and context as to be of no determinative significance.

■ Defendant argues alternatively that, based upon his past experience, Reed had a "reasonable expectation" of reward from the police for the information obtained from defendant and that his reasonable expectation was sufficient, in itself, to make Reed a police agent. While it cannot be doubted that past benefits bestowed on Reed by law enforcement officials during his surprisingly long career as an informer did tend to encourage his information-gathering activities, those past episodes did not constitute sufficient involvement in Reed's self-initiated interrogation of defendant to bring into play the exclusionary protection.

■ Any information obtained by Reed prior to the February 28 conversation with Forristall should not, therefore, have been suppressed. Defendant argues that there was no such information. He contends that all of the information was obtained from defendant after Reed's March 7 meeting with Detectives Forristall and Harris. In support of that contention he points

to the trial court's finding that all information was given after counsel had been appointed. Counsel was appointed, however, on the morning of February 28. The uncontradicted testimony of Detective Forristall was that on the evening of February 28 Reed related to him several admissions he had obtained from defendant. Reed testified that he spoke to defendant on several occasions and obtained new information each time. He also corroborated the February 28 conversation with Forristall. The court found that

> "Reed reported first to Officer Forristall and later to Officer Harris conversations with the defendant regarding a robbery for which defendant had been charged. * * * The contacts of Reed with Forristall and Harris took place over a five or six day period during which Reed talked to defendant four or five times."

Furthermore, the trial court's comments at the hearing on the motion for reconsideration indicated clearly that the court recognized that Reed related admissions of defendant to Forristall on February 28.

■ Information obtained from defendant by Reed during the period between the February 28 conversation with Forristall and the March 6 conversation with Forristall was also improperly suppressed. Although Forristall knew after the February 28 conversation that Reed was discussing defendant's case with him, the only evidence is that Forristall tried to make it clear to Reed that he did not condone such conduct. He cautioned Reed that he could not act as Forristall's agent and that he should not be asking questions of any inmate. (Mr. X had been transferred by that time.) Having attempted to make it clear that further information-gathering activity was not condoned, Forristall clearly was not responsible for Reed's continued questioning. See U.S. v. Mekjian, 505 F2d 1320 (5th Cir 1975).

When Reed and Forristall met on the evening of March 6, they discussed Mr. X, and Reed again mentioned defendant and the information concerning

[ 654 ]

the robbery. There was no evidence, however, that Forristall was any more receptive to that information than he had been on February 28. Any information obtained by Reed after that February meeting but prior to the March 7 meeting with Forristall and Harris should not have been suppressed.

■ Most of the detailed information contained in Reed's taped statement was apparently obtained after his encounter with Forristall and Harris on the morning of March 7. It was after that meeting that Reed returned to the cell and gave defendant his "sales pitch." By that time the extent of official involvement in Reed's activities with defendant was sufficient to bring the constitutional exclusionary protection into effect.

Were it not for the intervention of Detective Forristall, Reed would by then have been transferred to the federal penitentiary. Although he was detained in order to make it possible for a taped statement to be obtained, that additional detention also made it possible for him to continue his interrogation. Moreover, when Detective Harris showed up with a tape recorder and expressed interest in defendant, Reed was given positive encouragement to obtain additional incriminating statements. As Reed himself put it:

"Now this guy is a detective sergeant. If he's that concerned about this guy, maybe I ought to make it my business to find out something about him."

Reed interpreted Harris' display of interest as an opportunity to make some additional money. From past experience he apparently knew that the more detailed the statement, the better the reward. During the March 7 morning meeting Reed told Harris and Forristall that he needed money. Both Forristall and Harris were familiar with Reed's techniques. Nevertheless, after Harris asked about defendant and after Reed stated that he needed money they allowed Reed to go back to the cell and did nothing to discourage him from interrogating defendant further. That Reed's

[ 655 ]

apparent anger at being detained an additional day may have made his intentions less than completely clear does not detract from the conclusion that their actions encouraged him to get information from defendant.

We conclude that the admissions made to Reed after he returned to the cell from the March 7 morning meeting with Forristall and Harris were properly suppressed. Because the taped statement consisted so extensively of such admissions as to make impracticable separation of the admissible from the inadmissible, it was properly suppressed.

Affirmed in part; reversed in part and remanded for trial.