Argued and submitted September 10, 2012, convictions on Counts 1 through 4 reversed and remanded; otherwise affirmed June 4, petition for review allowed October 2, 2014 (356 Or 397)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHN ALBERT SINES,
*Defendant-Appellant.*

Deschutes County Circuit Court
06FE1054AB; A146025

328 P3d 747

Lisa A. Maxfield argued the cause and filed the brief for appellant.

Rolf Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

DUNCAN, J.

## DUNCAN, J.

In this criminal case, defendant appeals a judgment convicting him of four counts of first-degree sexual abuse, ORS 163.427, of his nine-year-old daughter, T. The jury acquitted defendant or deadlocked on eight other counts, two pertaining to T and six to defendant's son, V. Defendant contends that the trial court erred in (1) declining to suppress evidence obtained through the seizure and testing of a pair of T's underwear; (2) ruling that an expert witness, a forensic pathologist, was unqualified to offer his opinion on the probable source of spermatozoa found in T's clothing; and (3) admitting as exhibits foster mother's handwritten notes relating the circumstances of her conversations with T and V about sexual abuse by defendant.[1] We conclude that the seizure of the underwear was unlawful and, accordingly, the underwear and evidence derived from it should have been suppressed. That error was not harmless. Accordingly, we reverse and remand. We do not address defendant's second argument, regarding the defense pathologist. We also do not address defendant's argument regarding foster mother's notes. *See* OEC 803(5) (providing that, if admitted, a memorandum of past recollection "may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party").

Defendant raises three arguments in support of his view that evidence derived from the seizure and testing of the underwear should have been suppressed: First, defendant contends that acts of his employees, who took the underwear from his home and gave it to the police, constituted "state action," implicating the Oregon and United States constitutions, and, accordingly, probable cause and a warrant or an exception to the warrant requirement were required for the search and seizure. Second, defendant contends that the acceptance of the underwear by police—who knew that it had been stolen from defendant's home—constituted an additional seizure. Third, defendant argues that the testing of the underwear for spermatozoa and seminal fluid, which involved cutting numerous holes in the underwear and

---

[1] Defendant also contends that nonunanimous jury verdicts are unconstitutional. In light of our disposition of the case, we need not reach that argument.

using laboratory equipment to examine its contents, was an additional search.

We agree that the initial search of defendant's home and seizure of the underwear was state action subject to Article I, section 9, of the Oregon Constitution.[2] No warrant authorized the search or the seizure, and the state does not argue that any exception to the warrant requirement justified them. Accordingly, the search and seizure were unlawful, and we do not reach defendant's other arguments regarding the motion to suppress.[3]

In reviewing the denial of a motion to suppress, we are bound by the facts found by the trial court as long as there is constitutionally sufficient evidence to support them. *State v. Baker*, 350 Or 641, 650, 260 P3d 476 (2011). In the absence of a specific finding of fact, where there is evidence from which the trial court could have found a fact in more than one way, we presume that the court's finding was consistent with its ultimate conclusion. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We state the facts consistently with those standards.

Offizer was defendant's housekeeper. Defendant employed Taylor to help him with his business, which he ran from an office above his garage. On March 16, 2006, Offizer and Taylor discussed whether they should report their suspicion that defendant was sexually abusing T.

On March 20, Offizer called the Department of Human Services (DHS) anonymously to report her concerns. She told a DHS employee with whom she spoke, Cleavenger, that she had seen "discharge" on several pairs of T's underwear that "[l]ooked like maybe a 19-year-old was wearing [the underwear]." She told Cleavenger that she was considering taking a pair of T's underwear from defendant's house, and she asked Cleavenger what authorities could tell from

---

[2] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

[3] We refer to the search (of defendant's home) and the seizure (of the underwear) as "the seizure of the underwear."

it if she did so. Cleavenger told her that he could "hook her up" with someone in the law enforcement community who could have the underwear scientifically tested, thereby confirming or refuting her concerns. Offizer asked what would happen if she obtained the underwear, and Cleavenger told her, more than once, that he could not tell her to do that. Cleavenger gave Offizer his direct telephone number.

Cleavenger then consulted with Lieutenant McMaster at the Deschutes County Sheriff's Office. Although DHS policy required the completion of a safety check within 24 hours of a report of possible abuse—that is, an immediate response—in the absence of good cause for a delay, Cleavenger and McMaster decided to assign the case as a five-day response instead. Cleavenger later testified, "there was a likelihood—and I felt like a good likelihood—that the case was going to get stronger when [Offizer] made [her] decision." Cleavenger did not tell Offizer that he had delayed the safety check.[4]

On the afternoon of March 20, Offizer called Taylor and reported her conversation with DHS. Offizer told Taylor that her DHS contact had said, "We can't do anything without physical evidence," and Offizer and Taylor agreed that a pair of T's underwear would be the best type of physical evidence to get. Offizer was not scheduled to work at defendant's home the following day, but Taylor was, so Taylor said that she would try to obtain a pair of T's soiled underwear while she was at work.

The next morning, while defendant was taking the children to school, Taylor went into the laundry room in defendant's house, took the first pair of underwear she saw, put it in a plastic baggy, and put the baggy in her lunch bag. The underwear had a large amount of discharge in the crotch. After work, Taylor went to Offizer's house and gave her the underwear. Offizer called Cleavenger to tell him that she had the underwear. He told her to put it in a paper bag to prevent the destruction of any physical evidence. Cleavenger also arranged for Offizer to bring the underwear to the police the following morning.

---

[4] It appears that Cleavenger did not discuss safety checks with Offizer at all.

On the morning of March 22, Offizer met another DHS employee, Cloninger, and Detective Quick of the Deschutes County Sheriff's Office in a Wal-Mart parking lot, where Offizer gave them the paper bag containing the underwear and described some of her concerns regarding defendant's possible abuse of T and V. She asked Quick, "[D]id I do good by bringing this bag?" Offizer and Taylor testified at the suppression hearing that their purpose in taking the underwear was to assist law enforcement.

Quick and Cloninger immediately delivered the underwear to the Oregon State Police (OSP) Crime Lab in Bend. The lab director, Bordner, conducted two tests to determine whether the underwear contained spermato-zoa or seminal fluid. No warrant was obtained for either of the tests. Later that day, Bordner informed Quick that she had identified at least three spermatozoa heads on T's underwear.

The same day, Quick prepared a search warrant application using the test results and information he had gathered from Offizer, Taylor, and Cleavenger. That night, the warrant was executed, defendant was arrested, and additional property was seized, including a nightgown, pajama bottoms, a bathing suit, and jeans, all belonging to T. Later testing of those items revealed additional sperma-tozoa heads on all of them and, on the nightgown, evidence of seminal fluid as well.

Defendant was eventually charged with nine counts of sexual abuse in the first degree, one count of rape in the first degree, and two counts of sodomy in the first degree. The charges involved abuse of both T and V. Defendant filed a motion to suppress and supporting memorandum, asking the court to exclude

"all evidence, including derivative evidence and state-ments, obtained through the unlawful and warrantless (a) search of the laundry hamper in his home, (b) seizure of the underwear from the hamper, (c) seizure of the under-wear by police and (d) the destruction and testing of the underwear by the Oregon State Crime Lab."

After a hearing, the court concluded that (1) no state action was involved in Taylor and Offizer's taking of the underwear, (2) Quick's seizure of the underwear was lawful because Quick had "an objectively reasonable belief that the child's underwear contained evidence of a crime," and (3) the testing of the underwear did not constitute an unlawful search because, "[b]ased on the information [Quick] received from Defendant's housekeeper and his visual examination of the underwear, he had an objectively reasonable belief that * * * the underwear contained evidence of a crime and the testing would provide confirmation of that belief." Accordingly, it declined to suppress the evidence obtained from the underwear.

At defendant's trial, the state introduced the results of the testing of the underwear, which had eventually identified 17 spermatozoa. The state also introduced the results of the testing of the nightgown, pajama bottoms, bathing suit, and jeans. The jury convicted defendant of four counts of first-degree sexual abuse of T; it acquitted or deadlocked on the other eight counts. This appeal followed.

As described above, defendant first contends that Taylor's taking of the underwear constituted state action to which the Oregon and federal constitutions apply. We evaluate defendant's argument under the Oregon Constitution before evaluating his federal claim. *State v. Rogers*, 330 Or 282, 293-94, 4 P3d 1261 (2000). Article I, section 9, of the Oregon Constitution does not protect against a search by a private party. *See State v. Tanner*, 304 Or 312, 321, 745 P2d 757 (1987) (an interest protected by Article I, section 9, "is an interest against the state; it is not an interest against private parties"). When the state is sufficiently involved in a search or seizure conducted by a private party, however, state constitutional protections are implicated. *State v. Tucker*, 330 Or 85, 90, 997 P2d 182 (2000). Article I, section 9, precludes government "officials from participating or engaging indirectly in searches [or seizures] which would be illegal if conducted by the official." *State v. Becich*, 13 Or App 415, 419, 509 P2d 1232 (1973). There is no "hard and fast rule" for what constitutes state action, and we will consider any facet of state involvement that relates to the alleged search or seizure. *State v. Lowry*, 37 Or App 641, 652, 588

P2d 623 (1978), *rev den*, 285 Or 195 (1979).[5] Although this case presents a close question, we conclude that the state was sufficiently involved that the seizure of the underwear was state action.

Neither we nor the Supreme Court has explained with precision how much or what kind of state involvement is sufficient to trigger the protection of Article I, section 9. *See, e.g., Tucker*, 330 Or at 90 (where a private party conducts a search at the request of a law enforcement officer, the search is subject to Article I, section 9); *Becich*, 13 Or App at 419-20 (where a private party "volunteered" to conduct a search in response to an officer's demand for the return of stolen property and the officer drove by the defendant's home while the private party conducted the search, search was subject to Article I, section 9); *State v. Padilla*, 9 Or App 162, 166, 496 P2d 256 (1972) (where the defendant's roommate independently searched the apartment after police had finished searching it, search was not subject to Article I, section 9). However, our two holdings in *Lowry* provide context for our analysis here.

In *Lowry*, the state appealed the trial court's suppression of inculpatory statements elicited from the defendant by a police informant, Reed, while the defendant and Reed were lodged in the same cell in the Clackamas County Jail. 37 Or App at 643. Reed had been moved into the cell with, among others, the defendant and a murder suspect, "Mr. X," in order to gather information from Mr. X about an uncharged crime. *Id.* at 644-45. In addition to gathering information from Mr. X, Reed elicited inculpatory statements from the defendant about a robbery with which the defendant had been charged. Reed met with his law enforcement contact, Detective Forristall, on February 28 to discuss Mr. X; during that meeting, Reed also told Forristall

---

[5] Although the issue in *Lowry* was "whether there was sufficient official police involvement in [a private party's eliciting of statements from the defendant] to bring into play the exclusionary protection of the Fifth Amendment," 37 Or App at 650, we applied the same test that we had applied—and continue to apply—in cases like the present one, where the question is whether evidence must be excluded under Article I, section 9. *Id.* at 652 (citing and quoting *Becich*, 13 Or App 415); *see also State v. Waterbury*, 50 Or App 115, 119, 622 P2d 330, *rev den*, 290 Or 651 (1981) (citing and quoting *Lowry* on an Article I, section 9, issue [question of state action]).

about the defendant and the statements that he had made. Forristall did not know of the defendant before that meeting. At the February 28 meeting,

"[a]fter Reed related on his own initiative the information concerning defendant and the armed robbery, Forristall warned him that he 'could not act as an agent' for Forristall and that the detective 'didn't want him to go in there and start asking a whole bunch of questions of anybody from then on.'"

*Id.* at 646.

Despite those admonitions, Reed continued to collect inculpatory information from the defendant. On March 6, he met with Forristall again to discuss Mr. X and also gave Forristall more information obtained from the defendant. After that meeting, Forristall called Harris, who was the detective in charge of the defendant's case, and Harris asked to meet with Reed. Reed was scheduled for transfer to a federal penitentiary, but Forristall delayed the transfer for 24 hours so that Harris could obtain a taped statement from Reed.

The next day, March 7, the two detectives met with Reed and he relayed some of the information that the defendant had given him. After that meeting, Reed testified, he realized that he should elicit more detailed information from the defendant because of the detectives' interest. He went back to his cell and immediately "began one of his well-practiced approaches—which he termed a 'sales pitch'—to get more information from [the] defendant." *Id.* at 648. The "sales pitch" succeeded, and that afternoon, Reed related the details of the robbery to the detectives. Then the detectives paid him for a taped version of his information, which was subsequently used as evidence against the defendant.

We held that the information that Reed obtained before the March 7 meeting was admissible because, until then, Reed had been acting independently, without the knowledge or tacit approval of Forristall or Harris. First, we explained that, before February 28, Reed had interrogated the defendant "for his own purposes without any suggestion from the police. Detective Forristall did not even know of [the] defendant's existence before his conversation

with Reed on February 28." *Id.* at 652-53. As to the period between February 28 and March 7, we explained:

> "Although Forristall knew after the February 28 conversation that Reed was discussing defendant's case with him, the only evidence is that Forristall tried to make it clear to Reed that he did not condone such conduct. He cautioned Reed that he could not act as Forristall's agent and that he should not be asking questions of any inmate. (Mr. X had been transferred by that time.) Having attempted to make it clear that further information-gathering activity was not condoned, Forristall clearly was not responsible for Reed's continued questioning."

*Id.* at 654. Thus, as to the information that Reed obtained before March 7, the state was not sufficiently involved to trigger constitutional protections: At first, Forristall lacked any knowledge of Reed's conduct and, after he learned of Reed's conduct, he expressly admonished Reed not to ask any more questions.

However, the information that Reed obtained after the March 7 meeting had to be suppressed. We explained:

> "Were it not for the intervention of Detective Forristall, Reed would by then have been transferred to the federal penitentiary. Although he was detained in order to make it possible for a taped statement to be obtained, that additional detention also made it possible for him to continue his interrogation. Moreover, when Detective Harris showed up with a tape recorder and expressed interest in defendant, Reed was given positive encouragement to obtain additional incriminating statements. * * *

> "Reed interpreted Harris' display of interest as an opportunity to make some additional money. From past experience he apparently knew that the more detailed the statement, the better the reward. During the March 7 morning meeting Reed told Harris and Forristall that he needed money. Both Forristall and Harris were familiar with Reed's techniques. Nevertheless, after Harris asked about defendant and after Reed stated that he needed money they allowed Reed to go back to the cell and did nothing to discourage him from interrogating defendant further."

*Id.* at 655-56. Thus, our second conclusion in *Lowry* rested on two grounds: First, it was significant that Forristall

delayed Reed's transfer because it gave Reed time to continue his interrogation of the defendant. Second, by expressing interest in the defendant, the detectives demonstrated to Reed that it would be to his advantage to provide them with detailed information. Reed confirmed that proposition by stating that he needed money. Given that both parties then knew what Reed was likely to do, the detectives were sufficiently involved in Reed's decision to further interrogate the defendant to turn that interrogation into state action.

The facts here are not akin to the first scenario in *Lowry*. There, when Forristall learned that Reed had elicited information from the defendant, he told Reed not to ask any more questions. Here, when Cleavenger learned that Offizer was considering taking underwear from defendant's home, he did not tell her not to take it. However, that fact, alone, does not determine the outcome of our analysis.

The second scenario in *Lowry* is more similar to the facts here. In *Lowry*, at the March 7 meeting, the detectives' conduct conveyed to Reed that they were interested in the defendant, and Reed's comment that he needed money suggested that he would attempt to learn more. Here, Cleavenger avoided telling Offizer that she should take the underwear; although he did not discourage her from taking it,[6] he also told her that he could not tell her to take it.[7] He

---

[6] Cleavenger's statements to Offizer to the effect that he could not tell her to take the underwear did not constitute discouragement. In defendant's view, those statements communicated that, although Cleavenger was prohibited from telling Offizer to take the underwear, he would have done so if he had been able to. The state contends that, in light of the trial court's disposition of the motion, those statements may not be interpreted as implicit encouragement to take the underwear. However, regardless of whether the statements constituted encouragement, they did not constitute affirmative discouragement. Under any reasonable interpretation, saying "I can't tell you to take the underwear" is not the equivalent of saying "do not take the underwear."

[7] At the suppression hearing, Cleavenger characterized the end of his second conversation with Offizer as follows: "[W]e left it that she was going to have to search her own heart for the answer to th[e] question [whether to take the underwear]." Defendant asserts that Cleavenger was suggesting that the moral decision would be to assist the state. The state argues that it is not clear that Cleavenger actually told Offizer to "search her own heart," and, even if he did, he was simply advising her to make an independent decision. In keeping with the trial court's disposition, we assume that Cleavenger did not make that statement and, instead, that he used the phrase to describe the general tone of his conversation with Offizer. In light of our analysis, we need not, and do not, decide whether that tone put pressure on Offizer to take the underwear.

did explain that, if she took the underwear, he could "hook her up" with someone in the law enforcement community to test it. Like the detectives in *Lowry* after the March 7 meeting, after speaking with Offizer, Cleavenger knew that it was likely that Offizer would procure the underwear from defendant's house.

Despite the difference from the circumstances of *Lowry*, we conclude that Offizer's search was state action. That is so because Cleavenger knew that it was likely that Offizer would procure underwear from defendant's home, delayed the safety check to allow her more time to do so, and not only failed to do or say anything to prevent her from doing so, but actually offered law enforcement support if she procured the underwear. Most notably, Cleavenger's decision to postpone the safety check, which was made after consultation with the Deschutes County Sheriff's Office, represented a conscious choice to delay an evaluation of T's welfare in order to allow Offizer time to procure the underwear. Although Cleavenger may not have conveyed to Offizer that he wanted her to take the underwear, he nevertheless knew that it was likely that she would take it, and he deviated from ordinary DHS procedures and delayed the safety check in order to faciliate her search and seizure.

The state argues that this case is controlled by *State v. Waterbury*, 50 Or App 115, 120, 622 P2d 330, *rev den*, 290 Or 651 (1981), where we stated that a deputy might have given an informant some "implicit encouragement" in a search of the defendant's marijuana-growing operation but nevertheless concluded that there was no state action. In *Waterbury*, the defendant appealed a conviction for manufacturing marijuana, arguing that an informant's search of the defendant's marijuana-growing operation and seizure of marijuana was state action. 50 Or App at 117. The trial court had found the following facts:

"'[In response to a phone call] Deputy Nores met the informant on the steps of the courthouse. The deputy had never seen the informant prior to that time. The informant related that he had discovered what he thought were marijuana plants. He was vague about the location. He told of the necessity to climb a rope or lower himself into a pit to reach the plants. The officer believed from that description

the plants were probably in a narrow canyon. Actually they were in a building with a high barricade around all the walls. The officer asked the informant if the plants were on private or public property. The informant professed not to know, but that "he thought it was private property." The informant resisted answering inquiries concerning a more definite location of the plants. He finally told the deputy that he would meet him at a designated spot within a specific time. There was no clear understanding on the part of the deputy about what the informant was going to do, but a reasonable expectation could have been that the informant was going to produce further evidence to enable the deputy to obtain a search warrant. The informant met the deputy at the designated spot and brought with him some plants which the deputy immediately recognized as marijuana. The deputy and the informant then personally went before Judge Poole and obtained the search warrant.'"

*Id.* (insertion in *Waterbury*). On appeal, the defendant argued that "the officer encouraged the informant to make a search and then stood by waiting for the results, making an otherwise private search unlawful state action." *Id.* at 119.

We concluded that the informant's search was not state action. We explained:

"The trial court found that 'there was no clear understanding about what the informant was going to do, but a reasonable expectation could have been that the informant was going to provide further evidence to enable the deputy to obtain a search warrant.' While it could be said that the informant had some implicit encouragement from the police, absent any request or direct participation by the sheriff, we think such 'circumstantial encouragement,' if any, was insufficient official involvement to warrant applying the constraints of the exclusionary rule."

*Id.* at 120. That is, in the absence of a "clear understanding" by the deputy about what the informant's conduct would entail—whether it involved entering private property and what the informant would bring to or say at their next meeting—the deputy's agreement to meet the informant again, although it might have provided "implicit encouragement" for the informant to act, did not transform the search into state action.

The state contends that, because, in *Waterbury*, we referred to "[a] request or direct participation" by the state, *id.* at 120, express encouragement from a state actor is required to transform a private search into state action. *Lowry* demonstrates that that understanding of *Waterbury* is too broad. In *Lowry*, it was not necessary for the detectives to expressly encourage Reed to interrogate the defendant for Reed's conduct to constitute state action. Instead, the detectives' knowledge that it was likely that Reed would question the defendant was sufficient.

In addition, the facts of *Waterbury* are distinguishable from the facts in this case. In *Waterbury*, our comment that the deputy might have implicitly encouraged the informant was made in light of the trial court's finding that the deputy lacked a clear understanding of what the informant was going to do: The deputy did not know whether the marijuana was on private or public property and he did not know what kind of evidence or information to expect at their next meeting. When the deputy sought that information, the informant refused to provide it with any specificity. Because the deputy knew in only the vaguest terms what the informant's conduct might entail, he could not have known whether the informant's conduct would involve a "search[] which would be illegal if conducted by the [deputy]." *Becich*, 13 Or App at 419. In light of that uncertainty, the deputy's agreement to meet the informant again did not transform the informant's search into state action.

Here, there was no uncertainty about Offizer's proposed course of action. Cleavenger knew that Offizer's plan was to steal the underwear—defendant's personal property, *see* Donald T. Kramer, I *Legal Rights of Children*, § 8.12 (2d ed 1994) (parents retain property rights in items, like clothing, provided to their children for support or maintenance)—from defendant's home, and he believed, from their conversation, that she was likely to do it. Unlike the deputy in *Waterbury*, who may have implicitly encouraged conduct about which he lacked a clear understanding by agreeing to meet the informant again, Cleavenger had a clear understanding of Offizer's proposed conduct; it was obvious that taking the underwear involved a search and seizure "which would be illegal if conducted by [DHS or the police]." *Becich*,

13 Or App at 419. Nevertheless, Cleavenger delayed the safety check to give Offizer time to carry out her plan.

Because Cleavenger (1) knew what Offizer planned to do and that she was likely to do it, (2) communicated with Offizer about her plans and offered law-enforcement support if she conducted the seizure that the state could not carry out without a warrant, and (3) delayed the safety check to allow Offizer to accomplish the planned seizure, the seizure was state action subject to Article I, section 9, of the Oregon Constitution. Thus, because the underwear was seized without a warrant, it should have been suppressed unless the state showed that there was probable cause for the seizure and it fell within an exception to the warrant requirement. *Tucker,* 330 Or at 88-89; *State v. Davis,* 295 Or 227, 237, 666 P2d 802 (1983). The state did not, and does not, argue that any exception applies. Accordingly, the underwear-related evidence should have been suppressed.

The state contends that any error in failing to suppress the underwear-related evidence was harmless. In its view, even if that evidence had been suppressed, the jury still would have heard evidence of spermatozoa and semen found in T's nightgown, pajama bottoms, bathing suit, and jeans. Evidence regarding those garments, it contends, renders the evidence of the spermatozoa found in the underwear cumulative.

The state's argument rests on the premise that defendant's motion to suppress was not sufficient to notify the trial court or the state that he sought suppression of the evidence from the other items of clothing, all of which were seized pursuant to the warrant. As set out above, in his motion, defendant requested suppression of "all evidence, including derivative evidence and statements, obtained through" the seizure of the underwear. The state contends that, in the absence of a more specific explanation of which evidence derived from the seizure of the underwear, defendant's request was insufficient to alert it and the trial court to the fact that defendant sought suppression of items, including the clothing, seized pursuant to the warrant. Accordingly, in the state's view, even if the trial court had granted defendant's motion to suppress and excluded the underwear-related

evidence, the jury still would have heard evidence regarding the other items of clothing. That evidence, the state argues, would render the underwear-related evidence cumulative and, accordingly, harmless. *See State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009) (harmless error analysis requires court to assess "any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue").

A brief review of the facts is helpful as we consider the state's argument. As explained above, Taylor took the underwear from defendant's house and gave it to Offizer. Offizer gave the underwear to Cloninger and Quick, who took it to the OSP Crime Lab for testing. Bordner called Quick to tell him that she had discovered spermatozoa on the underwear, and that call prompted Quick to begin the search warrant application. In the application, Quick relied on Bordner's lab results and information that he and Cleavenger had obtained from Offizer and Taylor. Pursuant to the resulting warrant, police seized the nightgown, pajama bottom, jeans, and bathing suit.

We agree with the state that defendant could have made it more clear, in his motion to suppress, that he intended his challenge to extend to items—including the nightgown, pajama bottoms, jeans, and bathing suit—seized pursuant the warrant. However, in light of the evidence and argument at the suppression hearing, we conclude that the trial court and the state had fair notice of defendant's contention—which he proved—that the unlawful seizure and testing of the underwear led to the issuance of the warrant. It is undisputed that the nightgown, pajama bottoms, jeans, and bathing suit were seized pursuant to the warrant. Accordingly, if the trial court had suppressed the underwear-related evidence, it also would have suppressed evidence derived from the nightgown, pajama bottoms, jeans, and bathing suit.

At the suppression hearing, the parties and the court were aware that defendant contended that the seizure and testing of the underwear caused Quick to apply for the warrant. In cross-examining Cloninger, defense counsel asked whether "it was after the lab results came back that

Detective Quick then made the decision to get a warrant."
Cloninger replied, "Yes." Defense counsel confirmed that
"[t]here had been no discussion about getting a warrant in
advance of the lab results," and Cloninger replied, "Correct.
Not to me." Defense counsel also questioned Quick about his
decision to seek the warrant:

> "[Defense Counsel:] *** [I]t's also true that it was
> when you got the telephone call from Pam Bordner that
> you began immediately to write your search warrant
> affidavit—

> "[Quick:] That's absolutely correct.

> "[Defense Counsel:] So it's also true that it was Pam
> Bordner's call that was the—that prompted you to begin
> the search warrant application?

> "[Quick:] Yes."

The prosecutor recognized, and responded to, defen-
dant's contention that the seizure and testing of the under-
wear caused Quick to apply for the warrant. The prosecutor
sought to elicit testimony regarding information that Quick
had received from Taylor while the underwear was being
tested and on which Quick relied in applying for the war-
rant. That testimony was relevant to, among other things,
an attempt to prove that, even without the test results from
the underwear, there was probable cause for the warrant
to issue. In response to an objection by defense counsel, the
prosecutor stated that evidence regarding the information
in the warrant application other than the lab results was
relevant to determinations about probable cause for subse-
quent events, including the issuance of the warrant:

> "[Prosecutor]: Your honor, I believe [information that
> Quick received from Taylor] is going to go to the probable
> cause regarding after the underwear was seized and what
> was done with the underwear, because there were some
> other things that were done with the underwear, including
> a search warrant that was obtained as well.

> "The Court: I'll overrule—

> "[Prosecutor]: And I know there's not been a specific
> motion to controvert the warrant or a motion to suppress
> the warrant, but I believe it is relevant."

Thus, the prosecutor recognized that the seizure and testing of the underwear led to Quick's application for the warrant, and he believed that information that Quick obtained after the underwear had been seized and after testing had begun was relevant to the court's determination of whether there was "probable cause regarding [events, including the issuance of the warrant] after the underwear was seized." The court accepted that argument and allowed the testimony.

Because the trial court ruled that the seizure and testing of the underwear were not unlawful, it did not consider the subsidiary question of which other evidence derived from the seizure and testing of the underwear. However, the court and the parties were aware of the subsidiary question, and defendant met his burden of showing a minimal factual nexus between the seizure and testing of the underwear and the issuance of the warrant. *See State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005) (explaining the burden of a defendant seeking suppression). The state did not show that, notwithstanding that causal relationship, the warrant—or the evidence seized pursuant to it—did not derive from that seizure.[8] *See id.* (explaining the state's burden). The seizure of the nightgown, pajama bottoms, jeans, and bathing suit derived from the seizure of the underwear, and the trial court should have suppressed the evidence from the other items of clothing as well as the underwear-related evidence.

Finally, the state raises another harmlessness argument: It asserts that the jury could not have relied on any of the evidence of spermatozoa and seminal fluid on T's garments because it acquitted defendant of the counts involving sexual intercourse. In the state's view,

"[a]lthough spermatozoa on T's underpants would have supported convictions on count 5 (rape) and 6 (sodomy via anal intercourse), the jury *acquitted* defendant of those counts. To prove counts 1-4, the state relied exclusively on

---

[8] As noted above, the state presented evidence regarding the information, other than the test results, on which the warrant application was based, and it informed the court that that information was relevant to whether there was probable cause, *inter alia*, for the warrant to issue. However, that is not sufficient to overcome defendant's proof that the seizure and testing of the underwear caused the issuance of the warrant because no evidence suggests that Quick would have applied for a warrant in the absence of the seizure and testing of the underwear.

T's testimony (and on her pre-trial statements to others) that recounted defendant's conduct in touching her vaginal area, touching her breast, and kissing her lips."

(Emphasis in original.)

We disagree with that characterization of the state's use of the evidence. In closing argument, the prosecutor treated the physical evidence the same way with respect to all of the counts. The prosecutor listed the types of evidence that the state was relying on: testimony and statements of T and V, circumstantial evidence, and physical evidence—including "the expert testimony provided by Pam Bordner and the DNA scientist"—and then argued that the jury could "base [its] decision on [T and V's] testimony alone, but that's not all we have in this case." The only time the prosecutor discussed the counts individually during closing argument, he followed each count number with the statements of T or V that supported that count; he never asserted that jury should consider the physical evidence as to some counts but not others.

Thus, the state did not rely exclusively on T's testimony and pretrial statements as to Counts 1-4; rather, it encouraged the jury to consider all of the evidence. The evidence of spermatozoa and seminal fluid was relevant to Counts 1 to 4 in order to show that defendant's contacts with T were "sexual contact," ORS 163.305(6), and there is no reason to believe that the jury did not consider it. Accordingly, we cannot conclude that the erroneous failure to suppress evidence of spermatozoa and seminal fluid on T's garments was harmless.

Convictions on Counts 1 through 4 reversed and remanded; otherwise affirmed.