Submitted on remand from the Oregon Supreme Court June 6, 2016; convictions on Counts 1 through 4 reversed and remanded, otherwise affirmed September 20, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHN ALBERT SINES,
*Defendant-Appellant.*

Deschutes County Circuit Court
06FE1054AB; A146025

404 P3d 1060

Lisa A. Maxfield filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Shorr, Judge, and Duncan, Judge pro tempore.

## DUNCAN, J. pro tempore

This appeal comes to us on remand from the Supreme Court. In our initial opinion, we reversed and remanded defendant's convictions based on defendant's first assignment of error. We concluded that defendant's employees were acting on behalf of the state when they took a pair of defendant's nine-year-old daughter's underwear from a laundry hamper in his home and delivered it to a sheriff's deputy and, consequently, that evidence discovered in the underwear and the fruits of a search warrant based on that evidence were obtained in violation of Article I, section 9, of the Oregon Constitution. *State v. Sines*, 263 Or App 343, 328 P3d 747 (2014) (*Sines I*). On review, the Supreme Court reversed, concluding that "the actions of defendant's employees in searching for and seizing the underwear constituted private conduct and therefore did not violate Article I, section 9." *State v. Sines*, 359 Or 41, 62, 379 P3d 502 (2016) (*Sines II*). The court remanded the case to us to consider defendant's similar argument under the Fourth Amendment to the United States Constitution and, if necessary, to address defendant's remaining assignments of error. *Id.* at 43 n 1, 62.

On remand, we first conclude that, for the reasons articulated by the Supreme Court in *Sines II*, the employees' conduct was private conduct for purposes of the Fourth Amendment. Then we turn to defendant's second assignment of error, in which he argues that the trial court erred in denying his motion to suppress because the acceptance of the underwear by the deputy was an unlawful seizure under Article I, section 9, and the subsequent warrantless testing of the underwear was unlawful under both Article I, section 9, and the Fourth Amendment. We conclude that, even assuming that the officer's acceptance of the underwear was a lawful seizure, the testing of the underwear was an unlawful search under both Article I, section 9, and the Fourth Amendment. Because the testing was a search and was not justified by a warrant or any exception to the warrant requirement, defendant was entitled to suppression of the evidence derived from the testing.

Finally, as we did in *Sines I*, we conclude that the trial court's erroneous denial of defendant's motion to

suppress "all evidence, including derivative evidence and statements, obtained through the unlawful and warrantless *** testing of the underwear by the Oregon State Crime Lab" was not harmless. Consequently, we reverse defendant's convictions and remand for further proceedings.[1]

## I. HISTORICAL AND PROCEDURAL FACTS

We take the background facts, the facts regarding defendant's first assignment of error, and the procedural history of the case from the Supreme Court opinion. We set out additional facts as necessary during our discussion of defendant's second assignment of error.

"Early in 2005, defendant and his wife adopted two siblings—T, a young girl, and V, her brother. Approximately one year later, defendant's wife and biological son moved out of the family residence. Defendant's housekeeper subsequently began to discover indications of what she thought might be sexual activity between defendant and the then-nine-year-old T.

"The housekeeper had observed, among other things, that T was sleeping with defendant in his bedroom and, in the bed, the housekeeper had found a 'type of Vaseline stuff' '[u]p to half way up [defendant's] sheets,' as well as signs of the substance's use in the bathroom. Based on her observation of Vaseline-like handprints on the bathroom walls, the housekeeper believed that defendant 'had been having sex with somebody in the bathroom area,' despite the fact that defendant's wife had moved out and defendant had no girlfriend. When the housekeeper, concerned about the possible abuse of T, suggested to defendant 'to go get a girlfriend,' he told her 'he did not need one, he had T.'

"Defendant's housekeeper also observed a 'lot of discharge' in various pairs of T's underwear, noting that in some, the crotch of the garment had become so stiff that they had to be thrown away. According to the housekeeper, the heavily stained children's underwear appeared abnormal in that they did not look as if they had been worn by a child, but rather by a sexually active adult.

---

[1] We reject without discussion defendant's fifth assignment of error, in which he challenges the trial court's refusal to instruct the jury that a guilty verdict must be unanimous. We do not address defendant's third and fourth assignments of error, which challenge evidentiary rulings at trial, because it is uncertain whether those issues will arise again on remand.

"In March 2006, after consulting with another employee of defendant who worked in the home and also suspected that defendant was having sex with T, the housekeeper anonymously called a DHS [Department of Human Services] 'tip line' regarding the possible abuse. According to the DHS employee who took her call at around noon, the housekeeper appeared to be on the verge of tears, and first asked what the agency could determine from a pair of underwear. The DHS employee testified that he had responded by saying, 'Well, there's a lab here locally that can probably tell a lot. What's your concern?' The housekeeper then gradually related her observations regarding defendant and T, including the nature and extent of the discharge that she had observed on T's underwear, and told the DHS employee that she was considering taking a pair from defendant's house. The DHS employee reiterated several times that he could not tell her to take that kind of action, and that it was her decision. At the hearing on defendant's motion to suppress, the housekeeper stated that the DHS employee never asked her to get a pair of underwear; she said, 'No. Never.' She also testified, 'It was my idea.' The DHS employee gave the housekeeper his direct telephone number, expecting, based on their conversation, that she probably would take the underwear. The housekeeper retained her anonymity throughout their conversation, although she eventually disclosed the names of defendant and defendant's wife.

"Following the housekeeper's phone call, the DHS employee contacted a deputy at the Deschutes County Sheriff's Office. As a general matter, DHS policy called for safety checks to be conducted within 24 hours after receipt of a call regarding suspected abuse, unless there was good cause for delay. The DHS employee and the deputy sheriff instead decided to assign the case a five-day response time to see whether the housekeeper would take any action. Neither the DHS policy nor the decision to extend the time period was communicated to the housekeeper.

"The same day that she talked to DHS, the housekeeper called another employee of defendant who similarly suspected abuse and who was planning to work at defendant's house the next day. The housekeeper told the other employee, 'I'm thinking we need to get something of evidence,' and 'I'm thinking underwear.' The other employee said, 'I'll see what I can do.' The following day, while defendant was taking T and her brother to school, the

other employee went into the laundry room of defendant's house and took the first pair of T's underwear that she saw. She turned the underwear over to the housekeeper after work. The housekeeper then called her DHS contact, who arranged for her to bring the underwear to DHS and the deputy sheriff the next day, which she did.

"The child's underwear was immediately delivered to the Oregon State Police Crime Lab in Bend for testing. When the tests revealed spermatozoa on the garment, authorities obtained and executed a warrant to search defendant's house. Defendant was arrested at that time, and police seized other evidence, including a nightgown, pajama pants, a bathing suit, and jeans, all belonging to T. Tests conducted on those items revealed additional evidence of spermatozoa and seminal fluid.

"Defendant was charged with nine counts of first-degree sexual abuse, one count of first-degree rape, and two counts of first-degree sodomy, charges that involved both T and her brother, V. Before trial, as relevant here, defendant moved to suppress

"'all evidence, including derivative evidence and statements, obtained through the [housekeeper's] unlawful and warrantless (a) search of the laundry hamper in his home, (b) seizure of the underwear from the hamper, (c) seizure of the underwear by police and (d) the destruction and testing of the underwear by the Oregon State Crime Lab.'

"Following a hearing on that motion, the trial court denied defendant's motion. As to the initial taking of T's underwear by defendant's employees, the court reviewed the evidence at the hearing to determine whether, under the circumstances, either employee had acted 'as an instrument or agent of the government,' making their conduct 'state action' for purposes of Article I, section 9. It concluded that they had not. The trial court explained that the housekeeper 'was not directed [by the DHS employee] to seize [T's] underwear.' Rather, the employees themselves discussed and then executed a 'plan of action.' The court noted that the DHS employee did not encourage or participate in the seizure of the underwear and that, while he 'may have had an expectation that the housekeeper would likely obtain possession of the underwear,' he specifically told the housekeeper that he could not ask her to search

for or seize it. The court stated that any 'circumstantial encouragement' during his conversation with the housekeeper was 'insufficient governmental involvement to warrant application of the exclusionary rule,' citing *State v. Waterbury*, 50 Or App 115, 622 P2d 330, *rev den*, 290 Or 651 (1981). Accordingly, the trial court ruled that the actions of defendant's two employees 'do not constitute state action.' The trial court also held that the police acquisition of the underwear from the housekeeper was not an unlawful seizure, because that action was supported by 'an objectively reasonable belief that the child's underwear contained evidence of a crime,' and that the testing of the underwear was not an unlawful search, because the information provided to police officers by the housekeeper, together with a visual examination of the underwear, supported the 'objectively reasonable belief that * * * the underwear contained evidence of a crime and the testing would provide confirmation of that belief.'

"At the trial that followed, the state introduced the test results for the confiscated garments, and a jury convicted defendant on four counts of first-degree sexual abuse involving T; it deadlocked or acquitted on the remaining counts."

*Sines II*, 359 Or at 44-48 (brackets in *Sines II*; heading omitted; footnote omitted).

## II. ANALYSIS

### A. *Collection of Evidence by Third Party*

As the Supreme Court has instructed us to do, we begin by considering defendant's argument that the employees' conduct was "state action" for purposes of the Fourth Amendment even though it was private conduct under Article I, section 9. *Id.* at 43 n 1.[2] As explained below, the

---

[2] Defendant preserved his Fourth Amendment argument and raised it in his opening brief on appeal. Because we concluded in *Sines I* that he was entitled to reversal and remand based on a violation of Article I, section 9, we did not reach the Fourth Amendment argument. 263 Or App at 344, 345. Before the Supreme Court, the parties confined their arguments to Article I, section 9. *Sines II*, 359 Or at 43 n 1. After concluding that the employees' conduct was private conduct that did not implicate defendant's Article I, section 9, rights, the Supreme Court remanded for us to consider the Fourth Amendment argument in the first instance. *Id.* Because, as noted, defendant preserved that argument and raised it on appeal, we now address it.

Supreme Court's reasoning in rejecting defendant's argument under Article I, section 9, also answers the question under the Fourth Amendment.

Before the Supreme Court, the parties presented "two somewhat different approaches for determining when a search and seizure conducted by a citizen should be construed as state action and therefore subject to the constitutional protections provided by Article I, section 9, of the Oregon Constitution." *Id.* at 51. The state contended that the court should employ common-law agency principles to decide "when a private citizen is acting on behalf of or under the authority of the state"; defendant relied on a two-part test used by the Ninth Circuit Court of Appeals, "*viz.*: (1) Did the government know of and acquiesce in the conduct being examined, and (2) did the party performing the search intend to assist law enforcement rather than further the party's own ends?" *Id.* at 52.

The court concluded that the common-law agency analysis was the better choice and, accordingly, adopted it as the test for state action under Article I, section 9. *Id.*. at 53-59. Applying that analysis, the court concluded that the employees' conduct was not state action. *Id.* at 59-62. The court also rejected the argument that defendant presents under the Fourth Amendment: The court explained that, given the way the majority of federal cases use the terms "knowledge of" and "acquiescence in" otherwise private conduct, the facts here do not satisfy the first part of the two-part test that defendant urged the court to apply. *Id.* at 57 (citing *United States v. Smythe*, 84 F3d 1240, 1242-43 (10th Cir 1996); *United States v. Jarrett*, 338 F3d 339, 346 (4th Cir 2003), *cert den*, 540 US 1185 (2004); *United States v. Koenig*, 856 F2d 843, 847 (7th Cir 1988); and *United States v. Walther*, 652 F2d 788, 792 (9th Cir 1981)). The court explained that, "in application, the first part of defendant's proposed test—although using different words—does not appear to differ substantively from the agency principles we have discussed." *Id.*

That conclusion—that the federal test that defendant proposed, properly applied, yields a result unfavorable to defendant—also disposes of the argument that

defendant makes under the Fourth Amendment. Defendant contends that the employees were state actors under the Fourth Amendment because, applying the same test that defendant proposed that the Supreme Court should adopt under Article I, section 9, DHS knew of and acquiesced in the employees' conduct and the employees' purpose was to assist law enforcement. However, the Supreme Court held that, under these circumstances, DHS did not know of and acquiesce in the employees' conduct as those terms are used in the federal case law. *Id.* Accordingly, we reject defendant's argument that the employees were state actors under the Fourth Amendment when they searched for and seized the underwear from defendant's home.

B. *Acceptance and Testing of Evidence by the State*

We turn to defendant's second assignment of error, in which he asserts that the trial court erred in denying his motion to suppress because his constitutional rights were violated by two additional types of state action: First, defendant argues that the deputy seized the underwear without a warrant when he accepted it from the housekeeper, and, second, defendant argues that the crime lab's testing of the underwear involved three additional searches.

1. *Additional historical and procedural facts*

We begin by setting out additional facts relevant to defendant's arguments. We are bound by the facts found by the trial court as long as there is constitutionally sufficient evidence to support them. *State v. Campbell*, 306 Or 157, 159, 759 P2d 1040 (1988). In the absence of a specific finding of fact, where there is evidence from which the trial court could have found a pertinent fact in more than one way, we presume that the court's finding was consistent with its ultimate conclusion. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

As noted above, after the housekeeper obtained the underwear from the other employee, she called her DHS contact, who arranged for her to deliver the underwear to a DHS caseworker and the deputy sheriff assigned to the case, Detective Quick. The next morning, the housekeeper met with the caseworker and Quick in a Walmart parking

lot. She identified herself and told Quick about the observations that had caused her to believe that defendant was abusing T, including the discharge that she had seen in T's underwear.[3] With respect to the underwear, the housekeeper explained that she had seen discharge that she would expect to see in the underwear of a sexually active woman, not a nine-year-old girl. Quick understood that to mean that the housekeeper believed that the discharge was "the remnants of a male ejaculate * * * that was in the woman and leaked into the underwear."

After the meeting with the housekeeper, but before he left the parking lot, Quick opened the bag that contained the underwear and looked at it; he wanted to confirm what the housekeeper had told him about the substance in the underwear. He observed brown stains, "yellow-type stains, and * * * kind of a clear stain about the size of a 50-cent piece where the material was kind of stiff looking." He believed that the clear stain was the remnants of a male ejaculate that had been in T and leaked into the underwear.

Quick immediately delivered the underwear to the Oregon State Police Crime Lab in Bend for testing. The lab director, Bordner, tested the underwear for semen. To do that, she conducted two tests, one for seminal fluid and one for spermatozoa. To test for seminal fluid, she took 34 small cuttings from the underwear at even intervals across the whole crotch panel and tested them for acid phosphatase, which is present in seminal fluid. None of the cuttings tested positive for acid phosphatase. To test for spermatozoa, she took one more cutting from the underwear, extracted the cutting's contents with liquid, and then looked at the liquid extraction on slides under a microscope. Under

---

[3] The trial court determined that, when Quick accepted the underwear from the housekeeper, he "reasonably believed" that it contained evidence of a crime and again that, by the time he delivered the underwear to the Oregon State Police Crime Lab, he "reasonably believed" that the underwear contained evidence of a crime. On appeal, defendant assumes that that represents a determination that Quick had probable cause to believe that the underwear contained evidence of a crime; he argues only that probable cause does not justify a search or seizure absent an exception to the warrant requirement. Consequently, we assume that the trial court decided that Quick had probable cause, and, because defendant does not challenge that determination on appeal, we do not set out all the information that Quick obtained from DHS and from the housekeeper.

the microscope, any spermatozoa heads, as well as other cells, including yeast cells and epithelial cells, are visible.[4] Bordner saw several spermatozoa heads under the microscope. Those spermatozoa heads were later tested for DNA, which matched defendant's DNA profile.

That afternoon, Bordner called Quick to inform him that she had found three confirmed spermatozoa heads and eight to 10 other likely spermatozoa heads in the underwear. The call prompted Quick to begin an application for a search warrant for defendant's home. The test results figured prominently in his application. The warrant issued and was executed that night, and, during the search, deputies seized additional property, including a nightgown, pajama bottoms, a bathing suit, and jeans, all belonging to T. Later testing of those items—testing that took place long after defendant's motion to suppress was litigated—revealed additional spermatozoa heads on all of them and, on the nightgown, evidence of seminal fluid as well.

As explained above, defendant moved to suppress "all evidence, including derivative evidence and statements, obtained through the unlawful and warrantless * * * testing of the underwear by the Oregon State Crime Lab." In addition to asserting that the employees' conduct was "state action" under both the federal and state constitutions, defendant contended that (1) Quick seized the underwear, in violation of Article I, section 9, without a warrant or an exception to the warrant requirement when he accepted the underwear from the housekeeper and (2) Bordner unlawfully searched the underwear, under both constitutions, by cutting holes in it, testing it for acid phosphatase, and testing it for spermatozoa. As to defendant's first argument, the state responded that Quick's acceptance of the underwear was not an unlawful seizure because, when he accepted it, it was in plain view and, based on the housekeeper's information and the soiled underwear, Quick "reasonably believed" that it was evidence of a crime. The state also contended that "the underwear are [T]'s property and it is her privacy interest that is affected by the actions of Detective Quick [in opening the bag and examining the underwear]." As to defendant's

---

[4] Bordner testified that epithelial cells might be skin cells or vaginal cells.

second argument, the state contended that, "[o]nce a piece of evidence has been lawfully obtained, police can have that evidence tested and examined to confirm what the police have probable cause to believe that that evidence contains." (Citing *State v. Owens*, 302 Or 196, 729 P2d 524 (1986), and *State v. Langevin*, 84 Or App 376, 733 P2d 1383 (1987), *aff'd*, 304 Or 674, 748 P2d 139 (1988).)

In reply, defendant argued, *inter alia*, that defendant had a possessory interest in the underwear because he owned it even though it was for the use of T: "Parents have a legal obligation to support their children and they retain corresponding property rights in the items they provide their children for the purpose of support, maintenance, or education such as clothing and books. I Donald T. Kramer, *Legal Rights of Children*, § 8:12; 67 A CJS *Parent and Child*, § 119; *Hoblyn v. Johnson*, 55 P3d 1219 (Wyo 2002); *see also Potter v. Davidson*, 143 Or 101 (1933) (parent is entitled to the earnings of his minor children)."

The trial court held that, when Quick accepted the underwear, he had "formed an objectively reasonable belief that [T]'s underwear contained evidence of a crime," and that, when he delivered it to the lab, "he had an objectively reasonable belief that * * * the underwear contained evidence of a crime and the testing would provide confirmation of that belief." Based on those determinations, the court denied defendant's motion to suppress.

Defendant appeals. His arguments on appeal, and the state's arguments in response, are mostly similar to the arguments made before the trial court. We assume, for purposes of this opinion, that Quick's acceptance of the underwear from the housekeeper did not violate Article I, section 9, and, because it is dispositive, we focus on whether the testing of the underwear was constitutional. We begin by considering the testing of the underwear under the Fourth Amendment because, as explained below, that analysis sheds light on our consideration of the questions raised under Article I, section 9. We conclude that the warrantless testing of the underwear involved a search under both Article I, section 9, and the Fourth Amendment. No warrant was obtained, and the state does not argue that the search

was justified by any exception to the warrant requirement. Accordingly, the search was unconstitutional and the trial court erred in denying defendant's motion to suppress.[5]

## 2. *Article I, section 9, and the Fourth Amendment*

Article I, section 9, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."[6] The provision protects both possessory and privacy interests in those places and items. *State v. Cook*, 332 Or 601, 605-06, 34 P3d 156 (2001). A search takes place when a person's privacy interest is violated, that is, when governmental conduct "would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy." *State v. Dixon/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988); *see also Campbell*, 306 Or at 164 ("[T]he privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." (Emphasis in original.)). Under Article I, section 9, warrantless searches "are *per se* unreasonable unless they fall within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988); *see also, e.g., State v. Bonilla*, 358 Or 475, 480, 366 P3d 331 (2015) (collecting cases). Thus, for each warrantless search or seizure undertaken by the state, the state has the burden of proving that the action falls within an exception to the warrant requirement. *State v. Blair*, 361 Or 527, 534-35, 396 P3d 908 (2017). A defendant has "a constitutional right to exclude evidence obtained in violation of Article I, section 9" from a criminal prosecution. *State v. Tanner*, 304 Or 312, 315 n 2, 745 P2d 757 (1987).

---

[5] In addition to arguing that the testing of the underwear was an unconstitutional search, defendant also argues that Bordner's destruction of the underwear during the testing was an additional invasion of his possessory and privacy interests in the underwear. Because we conclude that the testing was unconstitutional, we need not, and do not, reach defendant's arguments regarding the destruction of the underwear.

[6] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment also prohibits unreasonable searches and seizures.[7] Whether a privacy interest is protected under the Fourth Amendment depends on whether an individual subjectively expects something to remain private and whether that subjective expectation of privacy is "one that society is prepared to recognize as reasonable." *Katz v. United States*, 389 US 347, 361, 88 S Ct 507, 19 L Ed 2d 576 (1967) (Harlan, J., concurring); *see also State v. Newcomb*, 359 Or 756, 773-74, 375 P3d 434 (2016) (describing federal test). As under Article I, section 9, under the Fourth Amendment, the government has the burden to show that a warrantless search or seizure was justified by an exception to the warrant requirement. *Katz*, 389 US at 357; *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983).

### 3. *Defendant's privacy interest in the evidence*

We begin with defendant's argument that, even if Quick's acceptance of the underwear was lawful, the testing of the underwear for semen required a warrant or an exception to the warrant requirement. Defendant argues that the testing, which, as explained above, involved cutting 35 fabric samples from the underwear, testing 34 of them for seminal fluid, and testing one of them for spermatozoa, invaded his privacy interest in one of his personal effects. The state responds that "[t]he testing would have implicated defendant's constitutional rights only if he had a 'right' to keep the state from discovering any sperm in the discharge on T's underpants, or if he reasonably expected that the presence of his sperm in the discharge would remain private." In support of that argument, the state contends that defendant "abandoned" any spermatozoa or semen in the underwear "by virtue of ejaculating inside T" and, consequently, that he lacked any privacy interest that would be invaded by testing the underwear for semen.[8]

---

[7] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[8] We note that the trial court did not employ that line of reasoning, and the state's alternative argument that defendant abandoned the spermatozoa in the

As a preliminary matter, our understanding of the scope of the privacy interest at issue is different from the state's. As defendant correctly asserts, a parent owns—that is, has property rights in—clothing provided to his or her child. I Donald T. Kramer, *Legal Rights of Children* § 8:6 ("[U]nless the child has been emancipated, or the property has in some definite way been given to the child as his or her own, the parent may reclaim [clothing, books, and toys furnished to the child for the purpose of support, maintenance, or education] or recover damages for its loss, injury, or destruction."). Thus, in our view, the first question here is whether, as a general matter, a defendant can retain a privacy interest in one of his effects taken from a laundry hamper in his home by a third party and turned over to the police. We readily conclude that he can. *See Newcomb*, 359 Or at 765 (under Article I, section 9, for ordinary property "that can be lawfully owned or possessed, such as a stereo or a folder," after a lawful warrantless seizure, the state may "'observe, feel, smell, shake and weigh'" the property "or otherwise 'thoroughly examine' its exterior without obtaining a warrant," but the state's ability to examine the interior of the property without invading a protected privacy interest "depends on whether the contents are open to view or the property 'by [its] very nature announce[s] [its] contents (such as by touch or smell)'" (quoting *Owens*, 302 Or at 206 (brackets in *Newcomb*)); *cf. Walter v. United States*, 447 US 649, 654, 100 S Ct 2395, 65 L Ed 2d 410 (1980) ("An officer's

underwear does not satisfy the requirements for an alternative basis for affirmance because the trial court did not make factual findings necessary to support that argument. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001).

As explained above, only spermatozoa heads, not seminal fluid, were found in the underwear. The state seems to assert that the trial court implicitly found that defendant abandoned the spermatozoa in the underwear by ejaculating inside of T. However, as explained above, the state never made any abandonment argument before the trial court, and, consequently, the court had no reason to, and did not, address that question. Even on the record before us—which might well have developed differently had the state raised its abandonment argument below—there was evidence that the spermatozoa heads could have been transferred onto the underwear in the laundry rather than as a result of sexual contact with T; thus, if the state had raised that argument below, the trial court might have found facts incompatible with the abandonment argument that the state advances on appeal. In the absence of predicate factual findings by the trial court, we cannot address the state's new appellate contention that defendant abandoned the spermatozoa that was found in the underwear.

authority to possess a package is distinct from his authority to examine its contents" under the Fourth Amendment; consequently, a private search that reveals some of the contents of a package to a state agent and justifies a warrantless seizure of the package "does not alter the [owner's] legitimate expectation of privacy," that is, it does not "strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection.").[9]

---

[9] Part of the Oregon Supreme Court's opinion in *State v. Luman*, 347 Or 487, 223 P3d 1041 (2009), suggests that, once a law enforcement agency accepts the fruits of a private search, it has unfettered authority to examine them however it chooses "for criminal investigatory purposes." *Id.* at 496 (emphasizing that third parties' delivery of a videotape belonging to the defendant to the sheriff's office gave a deputy sheriff "lawful possession of that evidence for criminal investigatory purposes"); *id.* at 500-01 (asserting that, in *State v. Munro*, 339 Or 545, 124 P3d 1221 (2005), seizure of a videotape pursuant to a warrant created "lawful[] possess[ion of] the videotape for criminal investigatory purposes" and that "the right to play and view the videotape" *"inhered* in the lawful seizure of the videotape" (emphasis in *Luman*)); *id.* at 501 (the private party's act of turning over the videotape to the sheriff's office in *Luman* "is the functional equivalent of the lawful 'seizure' in *Munro* under the authority of the warrant, which also gave the police lawful possession of the videotape"). That is, that part of *Luman* suggests that lawful possession of an item "for criminal investigatory purposes" entitles the police to examine the item in any way they choose without further constitutional constraint.

That reasoning is *dicta*. Immediately after explaining that line of reasoning, the court stated its holding, which is unrelated to the premise that lawful possession of the videotape allowed the sheriff's deputy to view the tape: "[B]ecause the sheriff's office's possession of the videotape for criminal investigatory purposes was lawful, any protected possessory or privacy interest defendant might have had in the videotape was lost, *at least to the extent that the employees had already viewed it*, and the deputy's subsequent *confirmatory* viewing of the videotape was not a constitutionally impermissible search." *Id.* at 501-02 (emphases added). Thus, the court's holding—that the deputy's act of watching the videotape was not a search—rested on the fact that the deputy's viewing was "confirmatory"; it invaded the defendant's right to privacy in the contents of the tape only to the same extent that that privacy interest had already been invaded and, in the court's view, destroyed, by the employees' viewing of the videotape. *Accord Walter*, 447 US at 659 (private party's search of a package destroys the owner's Fourth Amendment privacy interest in the contents only to the extent that the private search reveals the contents and, consequently, frustrates the owner's expectation of privacy). That holding is much narrower than the *Luman* opinion's earlier suggestion that "lawful possession" of an item by a law enforcement agency destroys any privacy interest that a defendant may have had in the item.

Moreover, that *dicta* is incorrect under both Article I, section 9, and the model for the court's holding in *Luman*, the Fourth Amendment. *See Newcomb*, 359 Or at 765 (seven years after *Luman*, explaining that, under Article I, section 9, lawfully seized property is subjected to a "search"—an invasion of a protected privacy interest—when a state agent "examin[es] the interior of the property" if the contents are not open to view and the property does not "by its very nature announce its contents" (internal brackets and quotation marks omitted)); *State v.*

Moreover, contrary to the state's argument, defendant did not need to have an independent privacy interest in the contents of the underwear. As explained immediately above, defendant's privacy interest was in *the underwear*, which he owned. A privacy interest in an item of personal property can exist regardless of the current condition of the property—regardless of what is in or on it. *Cf. Tanner*, 304 Or at 316-17, 317 n 3 (noting that the character of the defendant's effects discovered in a search—whether they were stolen goods—was irrelevant to whether the search itself was unlawful; moreover, "[e]ven as to the effect itself, this court has recognized that section 9 protects possessory and property interests in contraband"); *Clay v. State of Georgia*, 290 Ga 822, 831, 725 SE 2d 260, 269 (2012) (warrantless search of a bag containing the defendant's clothing covered with the blood of the victim violated defendant's Fourth Amendment reasonable expectation of privacy in defendant's effects). As we will explain, under both constitutions, defendant's privacy interest in the underwear was destroyed or frustrated by the employees' conduct to the extent that their delivery of the underwear to Quick revealed the underwear and its condition. But that does not change the initial question from what privacy interest remained in the underwear and its condition after Quick possessed it to whether defendant had any independent privacy interest in the substance that was on the underwear.

Although we generally analyze state constitutional questions before federal ones, in this case, we begin by discussing the Fourth Amendment, because the Fourth Amendment case law underlies the relevant Article I,

---

*Heckathorne*, 347 Or 474, 484, 223 P3d 1034 (2009) (explaining that, in *State v. Herbert*, 302 Or 237, 729 P2d 547 (1986), after an officer lawfully seized a paperfold on probable cause that it contained contraband, his further act of opening the paperfold was a search under Article I, section 9, but it was justified by probable cause and an exception to the warrant requirement); *see also State v. Moretti*, 521 A2d 1003, 1008-09 (RI 1987) ("*Walter* and *United States v. Jacobsen*, 466 US 109, 104 S Ct 1652, 80 L Ed 2d 85 (1984), recognize that remaining interests in privacy can exist when objects are seized during private searches and then given to law enforcement officials."); Wayne R. LaFave, 1 *Search and Seizure* § 1.8(b), at 393-94 (2012) (recognizing that principle in *Walter* and *Jacobsen*). Thus, we disregard the suggestion in *Luman* that the state's lawful possession of an item for criminal investigatory purposes destroys all of a defendant's privacy interest in that item and, consequently, that the state can examine the interior or contents of the item without any further restriction.

section 9, case law. After concluding that the testing involved a search for Fourth Amendment purposes, we consider Article I, section 9, and conclude that the result is the same under that provision.

### 4.  *Fourth Amendment analysis of testing of evidence*

In cases like this one, where government agents receive potentially incriminating evidence as a result of a third party's search, the question in determining whether there has been a search under the Fourth Amendment is whether the government conduct at issue significantly exceeded the scope of the private search. *Walter*, 447 US at 657 ("[T]he government may not exceed the scope of the private search unless it has the right to make an independent search."). In *Walter*, several sealed packages that contained boxes of films were misdelivered, and employees of the mistaken recipient opened the packages and discovered the boxes. *Id.* at 651. On one side of the boxes were "suggestive drawings, and on the other were explicit descriptions of the contents." *Id.* at 652. After unsuccessfully trying to view the contents of the films by looking at them in front of a light, the employees called the FBI. An agent picked up the packages, and, without a warrant, FBI agents watched the films using a projector. *Id.* The trial court denied the defendants' motion to suppress the films and the defendants were convicted on obscenity charges based on the films' contents. *Id.*

The Supreme Court reversed the convictions, holding that the agents' act of watching the films using a projector was a search that violated the Fourth Amendment. The lead opinion, by Justice Stevens, held that the agents' examination of the films was lawful only "to the extent that they had already been examined by third parties"; that is, "the Government may not exceed the scope of the private search unless it has the right to make an independent search." *Id.* at 656, 657. Justice Stevens explained:

"In these cases, the private party had not actually viewed the films. Prior to the Government screening one could only draw inferences about what was on the films. The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search. That

> separate search was not supported by any exigency, or by a warrant even though one could have easily been obtained."

*Id*. at 657 (footnote omitted). In a footnote, Justice Stevens explained that "[t]he fact that the labels on the boxes established probable cause to believe the films were obscene clearly cannot excuse the failure to obtain a warrant; for if probable cause dispensed with the necessity of a warrant, one would never be needed." *Id*. at 657 n 10.

In response to the government's argument that "because the packages had been opened by a private party, thereby exposing the descriptive labels on the boxes, [the defendants] no longer had any reasonable expectation of privacy in the films" at all, Justice Stevens rejected the idea that the fortuity of the third party's intervention affected whether the defendants had reasonably expected the contents of the packages to remain private. *Id*. at 658. Instead, he explained, the defendants retained their reasonable expectation of privacy in the contents of the packages that they had sealed and placed in the mail except to the limited extent that that expectation of privacy was "frustrated" because the contents were revealed by the private search:

> "The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy. The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection."

*Id*. at 658-59 (footnote omitted).

The Court adhered to that standard in *United States v. Jacobsen*, 466 US 109, 104 S Ct 1652, 80 L Ed 2d 85 (1984), in which it explained that "additional invasions of [the defendant's] privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *Id*. at 115. In *Jacobsen*, an FBI agent's examination of a tube, which had already been opened by a third party, and inspection of plastic bags of white powder inside "enabled the agent to learn nothing that had not previously been learned during the private search." *Id*. at 120. In reaching that conclusion, the Court noted specifically that

"there was a virtual certainty that nothing \* \* \* of significance [other than the white powder] was in the package and that a manual inspection of the tube and its contents would not tell him anything more than he already had been told." *Id.* at 119. Under those circumstances, the agent's examination "infringed no legitimate expectation of privacy and hence was not a 'search' within the meaning of the Fourth Amendment." *Id.* at 120.[10]

Then the Court considered whether immediate field testing of the contents of the plastic bag, which, unlike the agent's manual examination of the tube and bag, did "exceed[] the scope of the private search," constituted a separate search. *Id.* at 122. The Court concluded that it did not because "[t]he field test at issue could disclose only one fact previously unknown to the agent—whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder." *Id.* "A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy." *Id.* at 123. That is so precisely because the test reveals nothing except whether the substance is cocaine: "[E]ven if the results are negative—merely disclosing that the substance is something other than cocaine—such a result reveals nothing of special interest." *Id.* Because "Congress has decided \* \* \* to treat the interest in 'privately' possessing cocaine as illegitimate," "governmental conduct that can reveal whether a substance is cocaine, *and no other arguably 'private' fact*, compromises no legitimate privacy interest." *Id.* (emphasis added). In a footnote, the court noted that that holding, "of course, is confined to possession of contraband." *Id.* at 123 n 23.

This case is like *Walter*. Defendant's employees took the underwear from his home, looked at the substance on it,

---

[10] The Court also held that the "agents' assertion of dominion and control over the package and its contents" after the examination by the third party was a seizure, but a reasonable one. *Jacobson*, 466 US at 120. That is, under the Fourth Amendment, the defendant retained a possessory interest in his effect even after it was opened and searched by a third party and turned over to a law enforcement agency. *But see Luman*, 347 Or at 494 (asserting that, under the Fourth Amendment, a defendant retains no possessory interest in an effect after it is taken by a third party and turned over to the police; adopting that reasoning under Article I, section 9).

and gave it to Quick. That private search was like the private search in *Walter*, in which the third parties opened the packages to reveal the boxes, whose labels provided probable cause to believe that the films' contents were obscene. 447 US at 651-52. Here, the private search revealed that there was a substance on the underwear, and the information that the employees provided to Quick, as well as Quick's own examination of the underwear, yielded probable cause to believe that the underwear, in its present condition, contained evidence of a crime.

In *Walter*, although the third parties exposed the films themselves to visual inspection, the contents of the films were not visible to the naked eye—the third parties tried to view the films without any technological assistance, but that was not possible. *Id.* at 652. Because the contents remained unknown after the third parties' examination, the defendants retained a reasonable expectation of privacy in the contents of the films despite the probable cause provided by the labels: "[T]he private party had not actually viewed the films," and "[p]rior to the Government screening one could only draw inferences about what was on the films." *Id.* at 657. Thus, "[t]he projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search." *Id.*

Application of that reasoning here leads to the same conclusion. Here, the private search made the underwear available for Quick to examine, and he inspected it. However, based on the information available to Quick before the testing, "one could only draw inferences" about the condition of the underwear—whether it contained semen and, consequently, whether it was evidence of a crime. *Id.* at 657. Defendant retained a reasonable expectation that the unrevealed details of the condition of the underwear, one of his effects, would remain private. As a result, the testing of the underwear to reveal previously invisible characteristics of the substance on it "was a significant expansion" of the employees' search. *Id.*; *accord Jacobsen*, 466 US at 120 (no Fourth Amendment search where agent's actions "enabled the agent to learn nothing that had not previously

been learned during the private search"); *see also, e.g.,* *United States v. Lichtenberger,* 786 F3d 478, 488 (6th Cir 2015) (*Jacobsen* requires "virtual certainty" that inspection of the item and its contents by a state agent "'would not tell [him] anything more than he already had been told'" by the third party (quoting *Jacobsen,* 466 US at 119 (brackets in *Lichtenberger*))); *United States v. Donnes,* 947 F2d 1430, 1435 (10th Cir 1991) (officer's opening of camera lens case handed to the officer by a third-party searcher who had discovered it in a glove that also contained a syringe "exceeded the scope of the private search" because the third party "never opened the camera lens case or viewed its contents before turning it over to the officer").

Moreover, the field-testing exception from *Jacobsen* does not apply here. That exception applies to things that are "virtually certain" to be contraband, possession of which has been prohibited by Congress, when the test will reveal *only* "whether a substance is cocaine, *and no other arguably 'private' fact."* 466 US at 123, 125 (emphasis added). As to the first part of that requirement, here, the contents of the underwear were not even suspected to be, let alone virtually certain to be, contraband.[11] As to the second part, the test for spermatozoa heads could reveal myriad facts that, until the test, remained private. As explained above, that test involved extracting all of the contents of part of the underwear into a liquid and examining that liquid under a microscope. As demonstrated by Bordner's testimony about what she saw under the microscope—including yeast cells and skin or vaginal cells—microscopic examination could reveal medical information about T, as well as revealing the spermatozoa that, through further testing, revealed a DNA profile that matched defendant's.[12] That is very different

_____

[11] Even if the *Jacobsen* rule could be applied to more than contraband—a conclusion that the Court's express limitation, 466 US at 123 n 23, militates against—the situation here was that Quick reasonably believed that the substance in the underwear contained the remnants of ejaculate, not that he was "virtually certain" of that. Quick testified that his belief that the discharge contained semen was based on his experience with sexual abuse investigations in general, though he could not cite any training or experience in evaluating the contents of vaginal discharge.

[12] The test for acid phosphatase appears to meet the second part: It reveals only a positive or negative result and, consequently, confirms the presence of seminal fluid or, if the result is negative, "reveals nothing of special interest."

from a test that reveals only whether the substance is what police are "virtually certain" that it is, and "no other arguably 'private' fact." *Id.* at 123, 125; *see also State v. von Bulow*, 475 A2d 995, 1016 (RI), *cert den*, 469 US 875 (1984) (holding that warrantless testing by the police of a variety of prescription drugs (allegedly used by the defendant to attempt to kill his wife) found in a private search violated the Fourth Amendment; distinguishing *Jacobsen* on several grounds, including that the tests identified "the exact chemical composition of a myriad of substances whose identities were previously unknown to the state" and the condition in which the substances were discovered did not make it a virtual certainty that they contained nothing but contraband); *United States v. Mulder*, 808 F2d 1346, 1349 (9th Cir 1987) (warrantless lab testing of drugs was a search because it "was not a field test which could merely disclose whether or not the substance was a particular substance, but was a series of tests designed to reveal the molecular structure of a substance and indicate precisely what it is").

Thus, the testing of the underwear for semen was a "search" under the Fourth Amendment because it significantly expanded the scope of the private search by revealing information that was not known after the private search and after Quick's inspection of the underwear.

5.  *Article I, section 9, analysis of testing of evidence*

With that background in mind, we turn to Article I, section 9. In *Luman*, the Oregon Supreme Court adopted the basic reasoning of *Walter* and *Jacobsen*: A deputy sheriff's act of watching a videotape turned over by a private party who had watched the videotape and described its contents to the deputy was not a search because, under those circumstances, "any privacy interest that the property owner once may have had in that piece of evidence [was] destroyed, at least to the extent of the scope of the private search." 347 Or at 496.

---

*Jacobsen*, 466 US at 123. As noted above, however, in this case, Quick lacked virtual certainty of the presence of seminal fluid, and, moreover, seminal fluid is not contraband. Consequently, *Jacobsen*'s field-testing exception does not excuse the failure to obtain a warrant before conducting the acid phosphatase test.

In a footnote, the court noted *Jacobsen*'s field testing exception and stated that it "also is consistent with this court's jurisprudence under Article I, section 9." *Id.* at 498 n 6. We infer that the court was referring in that footnote to *Owens*, the case on which the trial court in this case appears to have relied when it concluded that suppression was not necessary despite the lack of a warrant because Quick "had an objectively reasonable belief that * * * the underwear contained evidence of a crime and the testing would provide confirmation of that belief."

In *Owens*, during a search incident to arrest, the police lawfully seized a clear vial that they found in the defendant's purse. 302 Or at 199. The officers could see that the vial contained white powder, and they had probable cause to believe that the powder was cocaine. Without a warrant, they opened the container and had the powder tested to confirm that it was cocaine, which it was. The trial court suppressed the evidence, concluding that the initial search of the defendant's purse was unlawful. *Id.* On appeal, the state argued, *inter alia*, that neither the opening of the container nor the testing of the powder was a search under Article I, section 9. With respect to the testing, the state argued that "no search warrant is required to test 'recognized contraband.'"[13] *Id.* After holding that the initial search of the defendant's purse was lawful, the court reasoned as follows:

> "Article I, section 9, protects privacy and possessory interests. A 'search' occurs when a person's privacy interests are invaded. When the police lawfully seize a container, they can thoroughly examine the container's exterior without violating any privacy interest of the owner or the person from whom the container was seized. For example, the police can observe, feel, smell, shake and weigh it.

---

[13] Although the Supreme Court's opinion does not say so explicitly, that argument may have relied on *Jacobsen*, 466 US at 123, in which, as explained above, the United States Supreme Court held that "Congress has decided—and there is no question about its power to do so—to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." In that respect, the Fourth Amendment differs from Article I, section 9, which recognizes rights against warrantless searches even when the searches reveal only contraband. *Tanner*, 304 Or at 316-17, 317 n 3.

Furthermore, not all containers found by the police during a search merit the same protection under Article I, section 9. Some containers, those that by their very nature announce their contents (such as by touch or smell) do not support a cognizable privacy interest under Article I, section 9. Transparent containers (such as clear plastic baggies or pill bottles) announce their contents. The contents of transparent containers are visible virtually to the same extent as if the contents had been discovered in 'plain view,' outside the confines of any container. Applying the doctrine of 'plain view' to transparent containers, we hold that no cognizable privacy interest inheres in their contents, and thus that transparent containers can be opened and their contents seized. No warrant is required for the opening and seizure of the contents of transparent containers or containers that otherwise announce their contents. Under the Oregon Constitution, a lawful seizure of a transparent container is a lawful seizure of its contents.

"When there is probable cause to believe that a lawfully seized substance is a controlled substance, a chemical test, for the sole purpose of determining whether or not it is a controlled substance, is neither a 'search' nor a 'seizure' under Article I, section 9. It is not a 'search' if the purpose of the test of a lawfully seized item is to confirm the presence of whatever the police have probable cause to believe is present in that item. A test for such a limited purpose does not infringe any privacy interest protected by the Oregon Constitution."

*Id.* at 206.

As the *Owens* dissent pointed out, the court's holding in that case rests on the assumption that, at least in those circumstances, the right to privacy afforded by Article I, section 9, extends only to information or items that are secret. *Id.* at 217 (Lent, J., dissenting); *id.* at 218 (Lent, J., dissenting) ("Knowledge of the contents of a protected 'area' [including the interior of one of a person's effects] is irrelevant to the question whether an invasion of that 'area' is a search."); *see also Tanner*, 304 Or at 321 n 7 (noting that one problem with an "expectations" approach to privacy "is that it too easily confuses privacy with secrecy"). Thus, under *Owens*, as a general matter, Article I, section 9, protects the contents of an opaque container because the contents are

secret, that is, not presently discernible. If a container is transparent and lawfully in view of an officer, its contents are not secret and, consequently, Article I, section 9, does not protect them. Thus, the police may open the transparent container without conducting a "search" because they already know exactly what they will find.[14] The same principle applies to containers that "announce" or reveal their contents by making those contents readily discernible through senses other than sight. *Id.*; *see also Heckathorne*, 347 Or at 485 (contents of metal cylinder "exposed and discernible" through sense of smell).

In a further application of the same secrecy principle, *Owens* holds that, if the police have probable cause to believe that a substance is contraband, they may "confirm" that belief through testing, also without invading a protected privacy interest, because, again, they already know what they will find.[15]

Turning back to this case, under *Luman*, the ultimate question under Article I, section 9, as under the Fourth Amendment, is whether the intrusion caused by the testing of the underwear exceeded the scope of the employees' search of the underwear. 347 Or at 496 (after third party's search of contents of videotape, defendant's privacy interest in videotape was destroyed, "at least to the extent" of the third party's search). The testing of the underwear exceeded the scope of the employees' search because, as explained above, the condition of the underwear—whether it contained evidence of a crime—remained unknown even after the employees gave it to Quick and he examined it. That is, "[p]rior to the [testing] one could only draw inferences about what was on the [underwear]." *Walter*, 447 US at 657.

---

[14] *But see Owens*, 302 Or at 217 (Lent, J., dissenting) (noting that, as would have been understood by the framers of Article I, section 9, and the Fourth Amendment, searches include physical trespasses to "persons, houses, papers, and effects, regardless whether anything 'secret' [is] at risk of discovery" and that, under Article I, section 9, that trespass analysis "retains its validity" (some internal quotation marks omitted)).

[15] As the *Owens* dissent pointed out, if it is not a search to test the contents of a transparent container, it is hard to understand why testing requires probable cause to believe that the contents are contraband; it seems that police should be able to undertake a nonsearch without any cause at all. 302 Or at 220 (Lent, J., dissenting).

Cutting pieces from underwear, chemically testing some of the pieces, extracting the contents of one piece into liquid, and examining the liquid under a microscope would certainly be "searches" under ordinary circumstances. *See, e.g., State v. Rhodes*, 315 Or 191, 196-97, 843 P2d 927 (1992) (officer's act of moving vehicle's door from a few inches open to all the way open constituted a search because the officer's "action permitted him to observe * * * what he otherwise could not have seen * * * from a lawful vantage point"); *accord State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983) ("[a] determined official effort to see or hear what is not plain to a less determined observer may become an official 'search,'" but photographs of the naked defendant taken across the street from his bedroom window with a telephoto lens "merely recorded what could be seen and had been seen without the camera").

As explained above, 287 Or App at 864-66, the fact that Quick had possession of the underwear does not change that principle: Lawful possession of an item of personal property by a law enforcement agency does not automatically extinguish the owner's privacy interest in the item. *See Newcomb*, 359 Or at 765 (privacy interest in the interior of a dog was not automatically extinguished by a lawful seizure of the dog); *Heckathorne*, 347 Or at 484 (explaining that, in *State v. Herbert*, 302 Or 237, 729 P2d 547 (1986), after an officer lawfully seized a paperfold on probable cause that it contained contraband, his further act of opening the paperfold was a search under Article I, section 9—it invaded a protected privacy interest—but it was justified by probable cause and an exception to the warrant requirement); *cf. Walter*, 447 US at 651 ("[A]n officer's authority to possess a package is distinct from his authority to examine its contents[.]").

Here, however, the state argues, and the trial court concluded, that those acts were not searches because, under *Owens*, law enforcement officers can always test any lawfully seized item "to confirm the presence of whatever the police have probable cause to believe is present in that item."[16] 302 Or at 206.

---

[16] We note that, under the state's broad understanding of the *Owens* testing principle, that rule effectively vitiates the principle stated immediately

We disagree that the holding in *Owens* applies to the situation here. We note that *Owens* itself involved confirmatory testing of contraband. Moreover, the field-testing exception in *Jacobsen*, on which it appears to have been based, is expressly confined to contraband. And, to our knowledge, the holding in *Owens* has not been applied to allow testing for evidence of a crime that is not contraband.[17]

above, that lawful possession of an object is distinct from the authority to examine its contents. In many cases, a law enforcement agency possesses an object only after an officer has probable cause to believe that it contains contraband or evidence of a crime. If the reasoning of *Owens* allows a further search to "confirm" the contents of any item whenever law enforcement has probable cause to believe that it contains contraband or evidence of a crime, then lawful possession (plus probable cause, which is frequently present) does effectively extinguish any privacy interest in the item seized. As explained above, the United States Supreme Court rejected that view in *Walter*. *See Walter*, 447 US at 657 n 10 ("[T]he fact that the labels on the boxes established probable cause to believe the films were obscene clearly cannot excuse the failure to obtain a warrant; for if probable cause dispensed with the necessity of a warrant, one would never be needed.").

Moreover, the Oregon Supreme Court's holding in *Newcomb* is inconsistent with that view. There, the disputed item—a dog—had been lawfully seized on probable cause to believe that it had been neglected. 359 Or at 769. The Supreme Court did not hold that the subsequent extraction and testing of the dog's blood was not a search because the officer had probable cause to believe that the blood would reveal evidence of animal neglect; instead it held that the extraction of blood was not a search because of the unique nature of a dog, as opposed to inanimate property. *Id.* at 775; *see also Heckathorne*, 347 at 484 (recognizing that, after a lawful seizure of a paperfold based on probable cause to believe it contained drugs, act of opening paperfold was a search (describing *Herbert*)).

[17] In *State v. Barnum*, 136 Or App 167, 902 P2d 95 (1995), *rev den*, 323 Or 336 (1996), a panel of this court was divided as to the application of *Owens* to a situation somewhat similar to the one before us. In *Barnum*, officers wanted an exemplar of the defendant's handwriting, which they believed would be evidence that he had committed a crime. At a hearing on a different charge, they saw him writing in a notebook, which they seized and read. From the notebook, they learned of additional crimes, with which the defendant was then charged. The trial court suppressed the notebook, and the state appealed.

The three panel members agreed that the trial court had not erred in granting the defendant's motion to suppress, but they disagreed as to why. The lead opinion, by Judge Armstrong, took the view that, "[i]f the officers had probable cause to believe that defendant's notebook contained evidence of a crime, they were required to obtain a warrant before opening it and reading it." *Id.* at 175. In a concurring opinion, Judge Edmonds disagreed, contending that, under *Owens* and *Herbert*, once the police had "lawfully seized the notebook, they were entitled to open it to confirm that it contained what they had probable cause to believe was there, *i.e.*, defendant's handwriting." *Id.* at 182 (Edmonds, J., concurring). (Judge Edmonds reasoned that the trial court was nevertheless correct to suppress the evidence based on another warrantless search of the notebook.) Judge Armstrong distinguished *Owens* and *Herbert* on the ground that, in those cases, "there was no reason to believe that the search would disclose anything other than that

Even if the nonsearch principle from *Owens* could apply to noncontraband evidence of a crime, however, it still would not justify the denial of defendant's motion to suppress in this case because, as explained above, 287 Or App at 870-72 the test for spermatozoa heads was not merely a confirmatory test. It involved the extraction and microscopic examination of substances on the underwear, through which different types of cells—including yeast, vaginal, skin, and spermatoza cells—could be discovered.

We have held that, under the reasoning in the first part of *Owens*, a privacy interest remains in the contents of a container and, thus, opening the container is a search, unless it is apparent "that contraband is [its] *sole* content." *State v. Kruchek*, 156 Or App 617, 621-23, 969 P2d 386 (1998), *aff'd by an equally divided court*, 331 Or 664 (2001) (emphasis in original). That is so because "[t]he rationale in *Owens* and its progeny is confined to situations in which there is no reason to believe that opening the container will result in any greater intrusion into a person's privacy than has already occurred through viewing or smelling the container." *Id.* at 622-23. "[U]nless it is apparent that the container at issue holds nothing other than contraband," opening the container does "constitute a search, because it [opens] to scrutiny contents that [are] not then known."[18]

the objects contained that which they were believed to contain, so the search would *not* invade any *remaining* privacy interest in the contents." *Id.* at 175 n 2 (emphasis in original). In his view, "the information known about the contents of the notebook before the search did *not* constitute everything that was private about them, because the notebook was expected to contain something more than a random combination of letters on which to make a handwriting comparison." *Id.* (emphasis in original).

In arguing that *Owens* and *Herbert* applied and allowed the police to search the notebook without a warrant once they had seized it lawfully, Judge Edmonds relied on an understanding of *Herbert* that has since been disavowed by the Supreme Court. *Compare Barnum*, 136 Or App at 181 (Edmonds, J., concurring) (arguing that, in *Herbert*, probable cause alone justified the warrantless search of a lawfully seized opaque paperfold), *with Heckathorne*, 347 Or at 484 (explaining that, although the court did not explicitly identify an exception to the warrant requirement in its discussion of the search of the paperfold in *Herbert*, it was clear that the holding rested on the fact that an exception applied).

[18] In arguing to the contrary, the dissent in *Kruchek* relied on the same understanding of *Herbert* that Judge Edmonds relied on in *Barnum* and that, as noted above, the Supreme Court subsequently disavowed in *Heckathorne*. *Compare Kruchek*, 156 Or App at 627 (Edmonds, J., dissenting) (arguing that "[t]his case is legally indistinguishable from *Herbert*"; consequently, because the

*Id.* at 622-23; *cf. Jacobsen,* 466 US at 119 (examination of an item turned over by a third party after a private search must be virtually certain not to reveal anything more than the officer has already learned through the private search).

For the same reason, *Owens* requires the same limitation on the warrantless testing of a substance of contraband: The testing must be such that it will not reveal any information other than whether or not the substance is contraband; otherwise, it will reveal secret information and, consequently, it will be a search. As explained above, *Owens* reasons that testing contraband is not a search when it is to determine "whether or not it is a controlled substance" and "to confirm the presence of whatever the police have probable cause to believe is present in that item." 302 Or at 206. That is so under the reasoning in *Owens* because

officer had probable cause to believe there was marijuana in the cooler, not only could he seize the cooler, but he could also open it without a warrant or an exception to the warrant requirement), *with Heckathorne,* 347 Or at 484 (explaining that, although the court did not explicitly identify an exception to the warrant requirement in its discussion in *Herbert,* it was clear that the holding rested on the fact that an exception applied).

The *Kruchek* dissent also tied the justification for the rule in *Owens* to the common law rule that "officers could arrest those who *committed crimes in their presence* and seize evidence of their crimes." 156 Or App at 627 (Edmonds, J., dissenting) (emphasis added). That line of reasoning provides another reason to believe that the rule of *Owens* is limited to situations in which there is probable cause to believe that a container contains contraband—that is, that a crime is being committed in the officer's presence—and does not apply when there is probable cause to believe merely that the container contains evidence of some previous crime that was not committed in the officer's presence.

The dissent in *Kruchek* also relied on *State v. Ready,* 148 Or App 149, 156, 939 P2d 117, *rev den,* 326 Or 68 (1997), in which we stated that, under *Owens,* "no warrant is required for the examination of evidence that announces its contents" as contraband and, consequently, held that no warrant was required to watch videotapes labeled "kid porn from Larry—movies then stills" that had been seized lawfully after they were discovered in plain view during a consent search. In light of the later holding in *Kruchek,* we understand *Ready* to present a situation in which it was reasonable to infer from the titles on the videos that "kid porn" was the *only* contents of the tapes. *But cf. Walter,* 447 US at 657 (where videotapes were labeled as pornography, the contents of the tapes were revealed only by inference; consequently, the defendant retained a Fourth Amendment expectation of privacy in the contents and a search warrant was required to view the tapes). The same can be said of *Heckathorne,* in which the Supreme Court held that the contents of a gas cylinder were revealed to be anhydrous ammonia by a strong smell of ammonia that emanated from the cylinder when it was "vented." 347 Or at 485.

the police already know exactly what they will find; they are merely "confirming" information that is no longer secret and, consequently, no longer protected by Article I, section 9. *Cf. Jacobsen*, 466 US at 123 (even if the results of a test to confirm that a substance is cocaine "are negative— merely disclosing that the substance is something other than cocaine—such a result reveals nothing of special interest").

Conversely, if the testing will reveal information other than whether or not the substance is contraband, it does invade a protected privacy interest because the police do not know exactly what they will find—the information is still secret. *Cf., e.g., Lichtenberger*, 786 F3d at 488 (under parallel reasoning in *Jacobsen*, agent had to have "virtual certainty" that inspection of the item and its contents "would not tell [him] anything more than he had already been told" by the third party (internal quotation marks omitted)); *Mulder*, 808 F2d at 1348 (under the Fourth Amendment, testing that revealed previously unknown molecular structure of tablets required a warrant because it did not merely confirm what police already knew). Here, as explained above, 287 Or App at 870-72, the test for spermatozoa heads could reveal information that, until the test, was unknown and unobservable, including information about T and defendant. Consequently, it did not merely confirm what police already knew, and *Owens* does not apply. Thus, the testing for spermatozoa heads was a search for purposes of Article I, section 9.[19]

As noted above, the state does not argue that any exception to the warrant requirement applies under either constitution. Accordingly, the warrantless testing of the

---

[19] We note that whether an action constitutes a search depends on the nature of the action, not its results. Thus, opening a closed container is a search, regardless of whether anything incriminating is found. Consequently, when determining whether the testing at issue in this case was a search, we focus on what the testing could have revealed, not what it actually revealed.

What the testing actually revealed is relevant to whether the erroneous admission of the search results was harmful, which we discuss below. Here, the spermatozoa testing resulted in the discovery of evidence that the state used against defendant, which in turn was used to gather other evidence against defendant.

underwear was unconstitutional, and the trial court erred in denying defendant's motion to suppress.

6.   *Harmless error analysis*

We adhere to our conclusion in *Sines I* that the error in denying defendant's motion to suppress was not harmless. *See* 263 Or App at 356-60. We reject without further discussion the state's argument that the underwear-related evidence had little relevance to the crimes of conviction. For the reasons below, we also reject the state's argument that evidence seized pursuant to the warrant rendered the admission of the underwear-related evidence harmless.

As we explained in *Sines I*, the state and the trial court were on notice that defendant contended that the warrant was the "fruit of the poisonous tree," *Wong Sun v. United States*, 371 US 471, 488, 83 S Ct 407, 9 L Ed 2d 441 (1963), and, consequently, that, if there was an unlawful seizure or search of the underwear, any evidence that had been seized pursuant to the warrant had to be suppressed. *See State v. Unger*, 356 Or 59, 72, 333 P3d 1009 (2014) (when an illegal search or seizure leads to the discovery of evidence, the question is "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'" (quoting *Wong Sun*, 371 US at 488)). At the suppression hearing, the trial court recognized that defendant's argument included that contention and, consequently, allowed both parties to make a record about the events that led to the warrant. Defendant proved that Quick's decision to apply for a warrant was prompted by the test results; thus, if the test results were illegally obtained, the warrant, and the evidence obtained pursuant to it, was "come at by exploitation of that illegality." *Id.* (internal quotation marks omitted). Equally, the state had the opportunity to show that Quick would have sought, and obtained, a warrant even in the absence of the test results. However, it did not do so. Although the state elicited testimony to support the view that there might have been probable cause to support the warrant application even absent the test results, it did not present any evidence that Quick

would have sought a warrant even in the absence of the test results.[20] *Sines I*, 263 Or App at 359 n 8.

Thus, both parties had the opportunity to make a record on whether the evidence seized pursuant to the warrant derived from the testing of the underwear. Defendant showed that that evidence was discovered through exploitation of the testing, and the state did not show that, even if the testing was unlawful, the warrant evidence nevertheless should not be suppressed. In these circumstances, we cannot rely on evidence seized pursuant to the warrant to conclude that the erroneously admitted underwear evidence was harmless; the evidence seized pursuant to the warrant also had to be suppressed.

## III.   CONCLUSION

In sum, we conclude that the housekeeper's collection of the underwear was not a state action under the Fourth Amendment, and we assume, without deciding, that the officer's acceptance of the underwear was not an unlawful seizure under Article I, section 9. But, we conclude that the subsequent testing of the underwear violated both the Fourth Amendment and Article I, section 9.

Under the Fourth Amendment, an officer who receives property from a third party cannot search the property in a manner that exceeds the scope of any search that the third party conducted and reported to the officer, unless the officer has the right to make an independent search. *Walter*, 447 US at 657-58. That is true even if the officer has probable cause to believe that the property contains evidence of a crime, because a search must be based on probable cause *and* a warrant or an exception to the warrant requirement. *Id.* at 657 n 10. Here, the testing of the underwear exceeded the scope of the visual observations made by

---

[20] Before the Supreme Court, defendant argued that the inevitable discovery doctrine is inapplicable here and, consequently, it is immaterial whether Quick would have applied for a warrant absent the test results. We express no opinion on that question. Our point here is only that the state was aware of defendant's contention that the testing of the underwear led to the issuance of the warrant, and, consequently, it had a full opportunity to put on whatever evidence it could to dispute defendant's view that the warrant, and the items seized pursuant to it, were fruits of the poisonous tree.

the housekeeper and the officer who received the underwear from her. The testing involved the extraction and microscopic examination of substances on the underwear and revealed information that was not previously known or observed.

In addition, the testing was not the type of testing that would merely confirm the presence of contraband, *see Jacobsen*, 466 US at 122-23 (authorizing confirmatory testing for cocaine), for two reasons. First, the testing was not for contraband; it was not for an illegal substance. *See id.* at 123 n 23 (court's holding regarding confirmatory testing is confined to contraband). Second, even assuming that a confirmatory test can be conducted for noncontraband, the spermatozoa testing here was not merely confirmatory, it was a general investigation that could reveal information beyond the mere presence of spermatozoa. *See id.* at 122 (holding that testing was confirmatory where it could not reveal anything other than whether the tested substance was what it was it was virtually certain to be). Thus, the testing was a search under the Fourth Amendment.

Similarly, the testing was a search under Article I, section 9. The testing exceeded the scope of the private search, and it provided previously unknown and unobservable information. *See Luman*, 347 Or at 496 (third-party search frustrates a privacy interest in a personal effect "to the extent of the scope of a private search"). And, for the same reasons discussed in connection with the Fourth Amendment, the testing was not a confirmatory test for contraband. *See Krucheck*, 156 Or App at 622-23 (explaining that the reasoning of *Owens* applies to inspections that will not reveal any information other than that already detectable).

Because, under both the Fourth Amendment and Article I, section 9, the testing was a search, it had to be justified by probable cause and a warrant or an exception to the warrant requirement. Here, the state did not obtain a warrant "even though one could have easily been obtained," *Walter*, 447 US at 657, and it has not identified any applicable exception to the warrant requirement. Therefore, the testing violated both the Fourth Amendment and Article I, section 9, and the trial court erred in denying the motion

to suppress the results—both direct and derivative—of the testing.

Finally, the error was not harmless. The state relied on the test results and the evidence derived from the results in its case against defendant.

Convictions on Counts 1 through 4 reversed and remanded; otherwise affirmed.